SHERRY H. *v.* PROBATE COURT

COTTER, C. J., LOISELLE, BOGDANSKI, LONGO and PETERS, Js.

Argued November 8, 1978—decision released March 20, 1979

*David Bixby,* law student intern, under the supervision of *Stephen Wizner,* with whom, on the brief, were *Edward Conan,* law student intern, *Mary F. Keller, Dennis E. Curtis,* and *Judith Resnik,* for the appellant (plaintiff).

*Michael J. Daly III,* with whom was *John D. Mahaney,* for the appellee (defendant).

Longo, J. This is an appeal by the plaintiff, Sherry H., an adopted person, from a judgment of the Superior Court dismissing her appeal from a judgment of the Probate Court denying her petition to view her original birth certificate pursuant to General Statutes § 7-53, as amended by Public Acts 1975, No. 75-170, hereinafter referred to as Public Act 75-170.[1] In dismissing the plaintiff's appeal,

[1] In her original petition, the plaintiff had also sought access to the records of her adoption. In her appeal to the Superior Court, however, the plaintiff abandoned her request to view her adoption records and has not pursued that claim in this court.

the Superior Court found that the revelation of the requested information would be detrimental to the welfare of the genetic mother and, exercising its discretion, further ruled that the petition should be denied because no supervision or restriction was imposed on the plaintiff's activities in the event that she obtained the information she sought.

The finding, with such corrections as are warranted, discloses the following: The plaintiff, Sherry H., was born in 1951 in Waterbury, Connecticut, and, at six months of age, was adopted through Jewish Family Services, hereinafter Family Services, in Hartford. At the age of five, she was told by her adoptive mother that she had been adopted. When she was sixteen, the plaintiff contacted Family Services concerning her adoption and family background and learned, inter alia, of her place of birth, that her genetic mother was a Russian Jew and was divorced, that she had been born out of wedlock, and that her genetic father had left the area upon learning of the pregnancy of her genetic mother. Thereafter, during 1973–1974, the plaintiff contacted James H. Kinsella, Judge of Probate at Hartford, and inquired whether she could look at her birth record. She subsequently wrote Judge Kinsella asking him not to pursue the matter, but afterwards called Judge Kinsella and learned that he had informally contacted someone at Family Services, whom he was unable to identify, who informed him that her mother did not wish to have her identity disclosed at that time. The plaintiff had no further direct contact with Judge Kinsella.

The plaintiff then contacted Family Services and spoke with a person who had talked directly with her genetic mother. In that conversation, she learned that the agency had contacted the plaintiff's mother,

who inquired as to the plaintiff's well-being; that her genetic mother had said that no one in her mother's family ever knew that she was pregnant with the plaintiff; and that the plaintiff was born out of wedlock and her genetic mother did not want her identity disclosed because no one knew. The genetic mother did not, however, indicate whether she would be willing to speak with the plaintiff on the telephone at some future time.

In February, 1976, with the support of her adoptive parents, the plaintiff filed a petition pursuant to Public Act 75-170 in the Probate Court at Waterbury, seeking to inspect her original birth certificate. The Probate Court (*Frederic E. Mascolo, J.*) in a judgment and decree dated May 4, 1976, decided that Public Act 75-170 required, inter alia, that the genetic parent give permission to the adopted child seeking inspection of her birth certificate, and denied the plaintiff's petition because she had failed to secure the consent of her genetic mother and did not provide the court with any evidence concerning the interests and desires of her genetic mother.

The plaintiff then appealed to the Superior Court. On appeal, the court, in a de novo proceeding, heard testimony from the plaintiff and from Judge Mascolo. In addition to the facts recounted above, the court found that Judge Mascolo, upon determining that the plaintiff's records were in Hartford, had written to Judge Kinsella and had contacted him by phone in connection with the plaintiff's petition. In their telephone conversation, Judge Kinsella told Judge Mascolo that he was well acquainted with the matter, and that his court had made an investigation and had found that the genetic mother did not want her identity disclosed. Judge Mascolo did not know

when the investigation was made; he conducted, however, no independent investigation concerning either the wishes of the plaintiff's genetic mother or the effect that disclosure of her identity would have on the parties. Judge Mascolo testified that he had concluded that the genetic mother would never give her consent to disclosure of the plaintiff's birth certificate. That conclusion, he testified, together with his assumption that most genetic parents did not wish to have their identities disclosed, formed the basis for his decision to deny the plaintiff's petition. The plaintiff made no further inquiry of Family Services concerning any possible change in her genetic mother's position; neither did the Superior Court conduct an independent investigation into the present situation of either genetic parent.

From those facts found, the Superior Court concluded that the plaintiff's genetic mother was unalterably opposed to disclosure of her identity; that there was no likelihood that the mother would change her position in this regard; and that disclosure of the genetic mother's identity would have a detrimental effect on her welfare, in that it would cause her embarrassment and mental anxiety because of the unexpected exposure of the past. The court further concluded that apart from the detrimental effect on the genetic mother, the plaintiff's petition should further be denied because no supervision or restriction was imposed on the plaintiff's activities "once her curiosity had been indulged," and that any possible benefit to the plaintiff by disclosure would be greatly outweighed by the likelihood of harm to the genetic mother.

The plaintiff moved for a remand to the Probate Court or for further investigation by the Superior

Court in order to obtain sufficient facts about her genetic parents to make a determination under Public Act 75-170. That motion was denied and the judgment of the Probate Court denying the plaintiff's petition was affirmed. From the dismissal of her appeal by the Superior Court, the plaintiff has appealed to this court.

The plaintiff makes numerous assignments of error relating to the court's findings and conclusions. For the disposition of this appeal, however, these claims present three issues for our consideration: (1) whether the proceedings below were controlled by the provisions of General Statutes § 7-53 as amended by Public Act 75-170 or by Public Acts 1977, No. 77-246, hereinafter referred to as Public Act 77-246; (2) whether, under the controlling statute, the court was required to conduct a timely and independent investigation into the effect that disclosure of the plaintiff's birth record would have on the welfare of her genetic mother; and (3) whether the court conducted such an investigation.

I

The plaintiff's petition in the Probate Court was brought, and the case was decided in the Probate Court and in the Superior Court, pursuant to the provisions of General Statutes § 7-53, as amended by Public Act 75-170.[2] While this appeal was pending, however, General Statutes § 7-53, as amended by Public Act 75-170, was repealed and in place thereof was substituted Public Act 77-246. This act sig-

[2] Public Acts 1975, No. 75-170, which repealed General Statutes § 7-53, provided, in pertinent part, that the record of an original birth certificate could be examined "upon a written order, signed by the judge of the probate court for the district in which the adopted person was born, stating that he is of the opinion that the examination of the birth record of the adopted person by the adopting

nificantly impacts upon both the ability of the adopted adult to examine a birth record and the procedures under which such an examination might take place. Under Public Act 75-170, access to birth records was intended to be essentially a matter of Probate Court discretion, the court weighing the effect of disclosure of the birth record on the welfare of the adopted person, on the welfare of the adopting and genetic parents, and on the public interest. See 18 S. Proc., Pt. 3, 1975 Sess., pp. 1247–48 (remarks of Sen. George C. Guidera); 18 H.R. Proc., Pt. 5, 1975 Sess., pp. 2379–80 (remarks of Rep. Martin B. Burke). Public Act 77-246, while retaining such a balancing approach to the disclosure of birth records, provides that a Probate Court may authorize the examination by an adult adopted person of a birth record, unless "(1) such information would identify the genetic parents and written consent of each identified genetic parent . . . has not been given." Public Act 77-246, § 15 (a) (1), and see also §§ 14–17; see 20 H.R. Proc., Pt. 8, 1977 Sess., pp. 3419–20 (remarks of Rep. Ernest N. Abate).

The defendant argues that Public Act 77-246 controls this appeal and that, under this act, the plaintiff's petition was properly denied as it did not appear that the plaintiff's genetic mother would consent to an examination of the birth certificate. As will immediately appear, we disagree with both of the defendant's contentions.

parents or the adopted person, if over eighteen years of age, or by the person wishing to examine the same or that the issuance of a copy of such birth certificate to the adopting parents, adopted person, if over eighteen years of age or to the person applying therefor will not be detrimental to the public interest or to the welfare of the adopted person or to the welfare of the natural or adopting parent or parents."

General Statutes § 1-1 (u) provides that "[t]he passage or repeal of an act shall not affect any action then pending." We have construed that provision to mean that "[s]tatutes should be construed retroactively only when the mandate of the legislature is imperative." *Adamchek* v. *Board of Education,* 174 Conn. 366, 369, 387 A.2d 556 (1978), quoting *Michaud* v. *Fitzryk,* 148 Conn. 447, 449, 171 A.2d 397 (1961); see *New Haven* v. *Public Utilities Commission,* 165 Conn. 687, 726, 345 A.2d 563 (1974); *Little* v. *Ives,* 158 Conn. 452, 457, 262 A.2d 174 (1969). Moreover, statutes that effect substantial changes in the law do not apply in pending actions unless it clearly and unequivocally appears that such was the legislative intent; *American Masons' Supply Co.* v. *F. W. Brown Co.,* 174 Conn. 219, 223, 384 A.2d 378 (1978); *E. M. Loew's Enterprises, Inc.* v. *International Alliance,* 127 Conn. 415, 418, 17 A.2d 525 (1941); *Old Saybrook* v. *Public Utilities Commission,* 100 Conn. 322, 325, 124 A. 33 (1924); and we have consistently expressed our reluctance to give such statutes retroactive application. *East Village Associates, Inc.* v. *Monroe,* 173 Conn. 328, 332, 377 A.2d 1092 (1977).

There is no indication in the legislative history to which we have previously referred that the legislature intended Public Act 77-246 to apply retroactively. In such a case, the test of whether a statute is to be applied retroactively "is not a purely mechanical one" and even if it is a procedural statute, which ordinarily will be applied retroactively without a legislative imperative to the contrary, "it will not be applied retroactively if considerations of good sense and justice dictate that it not be so applied. *Lavieri* v. *Ulysses,* 149 Conn.

396, 401, 180 A.2d 632; *E. M. Loew's Enterprises, Inc.* v. *International Alliance,* 127 Conn. 415, 418, 17 A.2d 525." *Carvette* v. *Marion Power Shovel Co.,* 157 Conn. 92, 96, 249 A.2d 58 (1968); *Jones Destruction, Inc.* v. *Upjohn,* 161 Conn. 191, 196, 286 A.2d 308 (1971). These aids to legislative interpretation apply with equal force to amendatory acts which effectuate changes in existing statutes. See *Lavieri* v. *Ulysses,* 149 Conn. 396, 402–403, 180 A.2d 632 (1962); 1A Sutherland, Statutory Construction (4th Ed.) § 22.36. The rule, however, that statutes which are general in their terms and affect matters of procedure can be applied retroactively does not include a statute which, though in form providing but a change in remedy, actually brings about changes in substantive rights. *Field* v. *Witt Tire Co.,* 200 F.2d 74, 77 (2d Cir. 1952); cf. *Lane* v. *Hopfeld,* 160 Conn. 53, 60, 273 A.2d 721 (1970); *Reese* v. *Reese,* 136 Conn. 191, 194, 70 A.2d 123 (1949).

We have concluded that Public Act 77-246 effected a "substantial change in the law"; *State ex rel. Rundbaken* v. *Watrous,* 135 Conn. 638, 648, 68 A.2d 289 (1949); *Massa* v. *Nastri,* 125 Conn. 144, 146, 3 A.2d 839 (1939); as such the act should not be given the effect of applying in the present case. Prior to the adoption of Public Act 77-246, the right of an adopted person to inspect a birth certificate was conditioned not on the consent of the genetic parents, but upon a determination of the effect of disclosure of the birth record upon the adopted person and upon the genetic and adopting parents. For the first time since the former § 7-53 was enacted; 1935 Cum. Sup., c. 18, § 64c; there now apparently exists a "parental veto" which significantly delimits, if not entirely extinguishes, the ability of

an adopted person ultimately to view a birth record. As the defendant concedes in its brief, "P.A. 77-246 creates a completely different scheme . . . and absolutely forbids release of information identifying the natural (genetic) parents without their consent." The allowing of such a "parental veto," as an absolute bar to the examination of the plaintiff's birth certificate, is precisely the rationale upon which the rule precluding the retroactive application of "substantive statutes" has been formulated. *E. M. Loew's Enterprises, Inc.* v. *International Alliance,* supra, 417–18; *Lazarus* v. *Metropolitan Elevated Ry. Co.,* 145 N.Y. 581, 585, 40 N.E. 240 (1895). We would apply that rule in the present case even if we were to characterize Public Act 77-246 as merely procedural. *Carvette* v. *Marion Power Shovel Co.,* supra, 96; *Lavieri* v. *Ulysses,* supra, 401. We hold that the statute controlling these proceedings is General Statutes § 7-53, as amended by Public Act 75-170.

## II

We pass next to the question whether Public Act 75-170 requires, as the plaintiff argues, an investigation into the effects of disclosure of the identity of the genetic parents upon all of the parties. The plaintiff argues that the court must conduct an investigation which is both timely, in order to secure the *present* circumstances and feelings of the genetic parents, and independent, in the sense that either the court, or a court-appointed third party, must conduct the investigation. We agree.

Although Public Act 75-170 does not expressly provide that an investigation of the sort described above be undertaken by the court, it does require

that examination of a birth certificate by the adopted person is authorized only if the probate judge is of the opinion that disclosure would not be detrimental to the public interest, or to the welfare of the adopted person, or to the welfare of the genetic or adopting parents. We must presume, however, that the legislature did not intend to enact useless legislation; *J & M Realty Co.* v. *Norwalk,* 156 Conn. 185, 192, 239 A.2d 534 (1968); and if we are to give effect to the obvious legislative intent underlying the act—that there be a careful evaluation and weighing of the respective interests of the parties— an investigation sufficient to ascertain those interests must be carried out.

Moreover, not only the legislative intent, but also considerations of fairness to both the adopted person and the genetic parents require an investigation which is both timely and independent. The act calls for a determination that disclosure would not be "detrimental" to the interests of the enumerated parties. In forming this opinion, the Probate Court must evaluate a number of factors that are subject to change over the course of time. The "welfare" of any of the parties, including the welfare of the genetic parents, is not a fixed, immutable condition; neither are the effects of disclosure on that welfare unchangeable. The genetic parents may have changed position regarding disclosure of their identity, may have since disclosed the fact of the adopted person's birth to others, and, indeed, may no longer be alive at the time a request for examination is made. All of these considerations dictate that the court's investigation occur in close proximity in time with the application to inspect a birth certificate.

Because of the nature of proceedings under Public Act 75-170, the court's investigation must also be independent. Under this act, proceedings in the Probate Court are not adversary proceedings; there is only one party, the applicant, before the court. The applicant cannot reasonably be expected to provide *all* of the information concerning the welfare of the genetic parents, whose identity is unknown to the applicant. Moreover, reliance on the applicant for information about the genetic parents places the court in the awkward position of looking to the applicant for information adverse to his or her petition.[3] An independent investigation would serve to minimize the procedural irregularities which inhere in placing such a burden on the applicant, such as reliance on hearsay information concerning the genetic parents, and would reasonably reduce the likelihood of misrepresentation of the circumstances of the genetic parents.

An examination of Public Act 77-246, which may be referred to in order to assist in gleaning the intent of the legislature in regard to the "investigation" required by Public Act 75-170; *Brown* v. *Cato,* 147 Conn. 418, 421, 162 A.2d 175 (1960); *General Realty Improvement Co.* v. *New Haven,* 133 Conn. 238, 242, 50 A.2d 59 (1946); clearly indicates that an independent investigation into the circumstances and welfare of all of the parties, by the court or a designated agency, must precede the court's authorization of an inspection of a birth record. See Public Act 77-246, §§ 14, 15 (a), and 16. This statement of the legislature indicates that a similar investigation is required under Public Act 75-170.

---

[3] We note that the Probate Court imposed upon the plaintiff the burden of providing the evidence necessary for a determination of the welfare and circumstances of her genetic parents.

In sum, we hold that the Probate Court, or its designee, is required, under Public Act 75-170, to conduct a timely investigation into what effect examination of the adopted person's birth record would have upon the welfare of the adopted person, upon the welfare of the adopting and genetic parents, and upon the public interest, and that the investigation must be conducted independently of any conducted by the applicant.

## III

Having concluded that Public Act 75-170 requires an investigation calculated to elicit the present desires of the parties, and the present effect that disclosure of the birth record would have upon the parties, we finally address the question whether such an investigation was undertaken by the Probate Court. We agree with the plaintiff that the investigation conducted by the court did not comport with the kind of investigation we have described in the preceding section.

As we initially indicated, no information was acquired concerning the circumstances of the genetic father. Apart from the plaintiff's testimony concerning her efforts to contact her genetic mother, the only investigation and the only contact with the genetic mother since the adoption of the plaintiff was one telephone conversation with an unidentified member of Family Services at the request of Judge Kinsella in 1973-1974, two to three years prior to the filing of the plaintiff's petition in the Probate Court. This could not have elicited the desires of the genetic mother in 1976; neither could the court have considered whether any relevant change in the genetic mother's circumstances had occurred. As both the Probate Court and the Superior Court

relied entirely upon Judge Kinsella's phone call to Family Services, there is little, if any, support for the Superior Court's finding that there was no reasonable likelihood that the genetic mother would ever give her consent. Neither the Probate Court nor the Superior Court acquired information concerning the effect on the parties of disclosure of the plaintiff's birth record independent of the single phone call made by Judge Kinsella three years earlier.

We cannot say that the Probate Court or the Superior Court, at the proceeding de novo, had acquired sufficient information to render an informed decision determining, as of 1976 (the date of the plaintiff's petition), the effect of disclosure of the plaintiff's birth record on the genetic parents. The case must be returned to the Probate Court for the district of Waterbury for a hearing, following an investigation under Public Act 75-170, and consistent with the views expressed in this opinion, as to the effect that allowing the plaintiff to examine her birth certificate would have on all of the parties.

There is error, the judgment is set aside, and the case is remanded to the Superior Court with direction to return the case to the Probate Court for further proceedings consistent with the views expressed in this opinion.

In this opinion the other judges concurred.