## SHARON MOORE *v.* HOWARD McNAMARA
### (12732)

PETERS, C. J., HEALEY, SHEA, DANNEHY and SANTANIELLO, Js.

Argued May 6—decision released August 12, 1986

*Michele R. Celentano,* for the appellant (defendant).

*Stephen J. McGovern,* assistant attorney general, with whom were *Charles Constanzo* and, on the brief, *Joseph I. Lieberman,* attorney general, for the appellee (state).

SHEA, J. This is an appeal from the judgment of the Superior Court finding that the defendant, Howard McNamara, is the father of the named plaintiff's child,

and ordering the defendant to pay weekly support until that child's eighteenth birthday, as well as arrearages to the state of Connecticut. On appeal, the defendant claims the trial court erred in concluding: (1) that the three year limitation upon the initiation of paternity actions prescribed by General Statutes § 46b-160, in effect at the time of the trial court's judgment, is unconstitutional; and (2) that blood grouping and human leukocyte antigen (HLA) test results are admissible to establish paternity. Because § 46b-160 has been amended to eliminate the three year statute of limitations, we need not reach the constitutional issue. Further, we hold that the trial court correctly construed § 46b-168 not to bar the inclusive use of blood grouping and HLA test results.

On June 15, 1982, Sharon Moore brought a paternity action against Howard McNamara alleging that he was the father of the child born to her on December 10, 1978. The defendant pleaded in a special defense that General Statutes § 46b-160[1] barred the action because

[1] "[General Statutes] Revised to Sec. 46b-160. (Formerly Sec. 52-435a). PETITION BY MOTHER OR EXPECTANT MOTHER. VENUE. CONTINUANCE OF CASE. EVIDENCE. Proceedings to establish paternity of a child born or conceived out of lawful wedlock, including one born to, or conceived by, a married woman but begotten by a man other than her husband, shall be instituted by a verified petition of the mother or expectant mother, with summons and order, filed in the superior court for the geographical area in which either she or the putative father resides. For trial purposes, jurors shall be selected from the judicial district in which such geographical area is located. In cases involving public assistance recipients the petition shall also be served upon the attorney general who shall be and remain a party to any paternity proceeding and to any proceedings after judgment in such action. Upon the filing of such petition, said court or any judge assigned to said court shall cause a summons, signed by him or by the clerk or assistant clerk of said court, to be issued, requiring the putative father to appear in court at a time and place named therein to show cause, if any he has, why the prayer of such petition should not be granted. Such petition, summons and order shall be in a form approved by the judges of the superior court. In the case of a child or expectant mother being supported wholly or in part by the state, service of such petition may be made by any inves-

the child was more than three years old when the suit was filed. The state, having assumed its party status pursuant to § 46b-160, because it had been paying lying-in expenses for the mother and child as well as support and maintenance for the child; see *Lavertue* v. *Niman*, 196 Conn. 403, 406, 493 A.2d 213 (1985); replied that the three year limitation on paternity actions violated the equal protection clause of the fourteenth amendment to the United States constitution. On April 25, 1984, the court, *Jackaway, J.*, denied the defendant's motion for summary judgment and held that Connecticut's three year statute of limitations was unconstitutional.

tigator employed by the department of human resources or the department of income maintenance. No such petition shall be brought after three years from the birth of such child, or after three years from cessation of contribution toward support of the child by the putative father, whichever is later, provided the provisions of section 52-590 shall be applicable to this section. If such putative father fails to appear in court at such time and place, the court may hear the petitioner and enter such judgment and order as the facts may warrant. Such court may order continuance of such hearing and if such mother or expectant mother continues constant in her accusation, it shall be evidence that the respondent is the father of such child."

Public Acts 1985, No. 85-548, § 3, effective October 1, 1985, amends § 46b-160 to permit paternity actions to be brought any time prior to the child's eighteenth birthday: "Sec. 3. Section 46b-160 of the general statutes is repealed and the following is substituted in lieu thereof:

"Proceedings to establish paternity of a child born or conceived out of lawful wedlock, including one born to, or conceived by, a married woman but begotten by a man other than her husband, shall be instituted by a verified petition of the mother or expectant mother, with summons and order, filed in the superior court for the geographical area in which either she or the putative father resides. For trial purposes, jurors shall be selected from the judicial district in which such geographical area is located. In cases involving public assistance recipients the petition shall also be served upon the attorney general who shall be and remain a party to any paternity proceeding and to any proceedings after judgment in such action. Upon the filing of such petition, said court or any judge assigned to said court shall cause a summons, signed by him or by the clerk or assistant clerk of said court, to be issued, requiring the putative father to appear in court at a time and place named therein to show cause, if any he has, why the prayer of such petition should not be granted. Such petition, summons and order shall be in a form approved by the judges of the superior court. In the case

On May 7, 1984, the defendant moved for a court order pursuant to General Statutes § 46b-168[2] requiring that he, the mother, and the child submit to blood tests. At trial the plaintiff sought to admit in evidence as an exhibit the results of the HLA and other blood tests prepared by Herbert Silver, a physician. These results were offered to show the statistical likelihood of the defendant being the father of the child. The defendant objected to the admission of the results, claiming them to be inadmissible because § 46b-168 states that the results of blood grouping tests "shall

of a child or expectant mother being supported wholly or in part by the state, service of such petition may be made by any investigator employed by the department of human resources or the department of income maintenance. [No such petition shall be brought after three years from the birth of such child, or after three years from cessation of contribution toward support of the child by the putative father, whichever is later; provided the provisions of section 52-590 shall be applicable to this section.] SUCH PETITION MAY BE BROUGHT AT ANY TIME PRIOR TO THE CHILD'S EIGHTEENTH BIRTHDAY, PROVIDED LIABILITY FOR PAST SUPPORT SHALL BE LIMITED TO THE THREE YEARS NEXT PRECEDING THE GRANTING OF ANY SUCH PETITION. If [such] THE putative father fails to appear in court at such time and place, the court may hear the petitioner and enter such judgment and order as the facts may warrant. Such court may order continuance of such hearing; and if such mother or expectant mother continues constant in her accusation, it shall be evidence that the respondent is the father of such child."

[2] "[General Statutes] Sec. 46b-168. (Formerly Sec. 52-184). BLOOD TESTS WHEN PATERNITY IS IN DISPUTE. ASSESSMENT OF COSTS. In any proceeding in which a question of paternity is an issue, the court, on motion of any party, may order the mother, her child and the putative father or the husband of the mother to submit to one or more blood grouping tests, to be made by a qualified physician or other qualified person, designated by the court, to determine whether or not the putative father or the husband of the mother can be excluded as being the father of the child. The results of such tests shall be admissible in evidence only in cases where such results establish definite exclusion of the putative father or such husband as such father. The costs of making such tests shall be chargeable against the party making the motion, provided if the court finds that such party is indigent and unable to pay such costs, such costs shall be paid by the state. If the costs of making such tests are paid by the state and the party making the motion is subsequently adjudicated to be the father of the child, such party shall be liable to the state for the amount of such costs."

be admissible in evidence only in cases where such results establish definite exclusion of the putative father . . . ." The trial court, *Reilly, J.,* overruled the defendant's objection.

On the basis of the testimony, the blood test results, and a visual comparison of the child with the defendant, the trial court found that the defendant is the father of the child.[3] The court ordered the defendant to pay $15 per week in child support, an additional $10 per week to the state toward an arrearage of $11,687.93, and an additional $5 per week to the plaintiff's attorney until the sum of $2187.50 is paid in full.

I

We need not address the defendant's first claim that the trial court erred in concluding that the three year limitation upon the initiation of paternity actions prescribed by General Statutes § 46b-160 is unconstitutional. This court has a basic judicial duty to avoid deciding a constitutional issue if a nonconstitutional ground exists that will dispose of the case. See generally *Rescue Army* v. *Municipal Court,* 331 U.S. 549, 568–74, 67 S. Ct. 1409, 91 L. Ed. 1666 (1947); *Ashwander* v. *Tennessee Valley Authority,* 297 U.S. 288, 346–47, 56 S. Ct. 466, 80 L. Ed. 688 (1936) (Brandeis, J., concurring); *Negron* v. *Warden,* 180 Conn. 153, 166, 429

---

[3] The trial court in its memorandum of decision, filed June 6, 1985, stated its finding of evidentiary facts that relate to the sexual relations of and between the named parties: "The Court after having heard all of the testimony, and after a review of the exhibits, finds that the Plaintiff has proven that, during the period in question, the Petitioner Sharon Moore was a single woman and that the child in question was conceived on March 4, 1978, at the Defendant's apartment when the Petitioner and the Defendant engaged in sexual relations. The Court further finds that the child in question was born on December 10, 1978. The court further finds that during this period when the child was conceived the Petitioner Sharon Moore did not have sexual relations with any other man. The Court further finds that the Defendant acknowledged the paternity of said child to his daughter Linda. It is further found that the child bears a striking resemblance to the Defendant."

A.2d 841 (1980). "The best teaching of this Court's experience admonishes us not to entertain constitutional questions in advance of the strictest necessity." *Parker* v. *Los Angeles,* 338 U.S. 327, 333, 70 S. Ct. 161, 94 L. Ed. 144 (1949). "Appropriate deference to a coordinate branch of government exercising its essential functions demands that we refrain from deciding constitutional challenges to its enactments until the need to do so is plainly evident." *State* v. *Madera,* 198 Conn. 92, 105, 503 A.2d 136 (1985). Effective October 1, 1985, the state legislature amended § 46b-160 to increase the statute of limitations for asserting paternity claims from three years to eighteen years.[4] Public Acts 1985, No. 85-548, § 3. It would be inappropriate for this court to resolve the constitutional issue the parties have briefed without first deciding whether the new eighteen year statute of limitations contained in Public Acts 1985, No. 85-548 is applicable to this case, thus making unnecessary a determination of the validity of the former three year statute.[5] The issue then becomes whether the new eighteen year statute of limitations is to be applied retroactively to the defendant.

---

[4] See footnote 1, supra.

[5] The brief of the plaintiff-appellee mentions the enactment of Public Acts 1985, No. 85-548, allowing a paternity action to be brought "at any time prior to a child's eighteenth birthday." The brief also declares that "the act, effective October 1, 1985, will relieve the Connecticut trial courts of the responsibility of determining what time limit would meet the *Mills* criteria." It thus appears that the defendant was alerted to the existence of the new statute of limitations and the claim of the plaintiff that in any subsequent proceeding in the trial court involving the paternity of the child that a remand might necessitate, the eighteen year statute of limitations would control. Obviously, if the new statute now controls the ultimate disposition of the paternity claim against the defendant, as we conclude, it would serve no useful purpose to determine whether our former three year statute is subject to the infirmities that have resulted in invalidating the one year statute in *Mills* v. *Habluetzel,* 456 U.S. 91, 102 S. Ct. 1549, 71 L. Ed. 2d 770 (1982), or the two year statute in *Pickett* v. *Brown,* 462 U.S. 1, 103 S. Ct. 2199, 76 L. Ed. 2d 372 (1983).

It is a rule of construction that legislation is to be applied prospectively unless the legislature clearly expresses an intention to the contrary. See *Enfield Federal Savings & Loan Assn.* v. *Bissell,* 184 Conn. 569, 571, 440 A.2d 220 (1981). The rule is rooted in the notion that it would be unfair to impose a substantive amendment that changes the grounds upon which an action may be maintained on parties who have already transacted or who are already committed to litigation. See *Lavieri* v. *Ulysses,* 149 Conn. 396, 401, 180 A.2d 632 (1962); *E.M. Loew's Enterprises, Inc.* v. *International Alliance,* 127 Conn. 415, 418, 17 A.2d 525 (1941). In civil cases, however, unless considerations of good sense and justice dictate otherwise, it is presumed that procedural statutes will be applied retrospectively. See *State* v. *Paradise,* 189 Conn. 346, 351, 456 A.2d 305 (1983); *Lavieri* v. *Ulysses,* supra. Procedural statutes have been traditionally viewed as affecting remedies, not substantive rights, and therefore leave the preexisting scheme intact. See, e.g., *Sherry H.* v. *Probate Court,* 177 Conn. 93, 100–102, 411 A.2d 931 (1979).

"A statute of limitations is generally considered to be procedural, especially where the statute contains only a limitation as to time with respect to a right of action and does not itself create the right of action. *Jones Destruction, Inc.* v. *Upjohn,* 161 Conn. 191, 195, 286 A.2d 308 (1971)." *Collucci* v. *Sears, Roebuck & Co.,* 585 F. Sup. 529, 532 (D. Conn. 1984). This is so because it is considered that the limitation merely acts as a bar to a remedy otherwise available. *Lewis* v. *Rosen,* 149 Conn. 734, 735, 181 A.2d 592 (1962). Where a statute of limitations is procedural, it is subject to waiver; unless specifically pleaded it is deemed waived and the remedy continues beyond the prescribed period. See *Orticelli* v. *Powers,* 197 Conn. 9, 15, 495 A.2d 1023 (1985). Where, however, a specific limitation is contained in the statute that creates the right of action

and establishes the remedy, the remedy exists only during the prescribed period and not thereafter. In this situation, the statute of limitations is considered substantive or jurisdictional rather than procedural or personal, and therefore may not be waived. Id.; *L.G. DeFelice & Son, Inc.* v. *Wethersfield,* 167 Conn. 509, 511, 356 A.2d 144 (1975).

At common law there was no remedy to compel a putative father to contribute to the support of his illegitimate offspring. One commentator explained: "At Common Law neither the mother nor putative father is liable to maintain a natural child. The right of custody being absent, the correlative duty of maintenance was absent also. The child of nobody was as regards its support the child of the people, and the people in the shape of the overseers had to undertake its succour." W. Hooper, The Law of Illegitimacy (1911), pp. 135–36.[6] In an early legislative rejection of the common law rule that an illegitimate child was nullius filius, Connecticut enacted its "statute of bastardy."[7] In *Hinman* v. *Taylor,* 2 Conn. 357 (1817), the court stated: "A suit for the maintenance of a bastard child is a statutory process *sui generis* . . . . The statute creates a right to commence and prosecute a civil suit . . . ." Id., 360.

---

[6] But cf. *Humphrys* v. *Polak & Wife,* 2 K.B. 385, 85 L.T. 103 (1901), reported in Cockle & Hibbert's Leading Cases in Common Law—With Notes, Explanatory and Connective—Presenting a Systematic View of the Whole Subject (2d Ed. 1929), p. 161: "I am inclined to think that there was at common law a duty on the part of the mother towards such child, and that the series of legislative enactments on the subject, such as the Poor Law Amendment Act, 1834 (4 & 5 Will. 4, c. 76), s. 71, did not create that duty, but merely recognised and defined it . . . ."

[7] See Public Statute Laws (Rev. of 1821), tit. 8 n.1, explaining: "In the revision of 1672, an act appears, subjecting the father of a bastard child to the maintenance of it, with the assistance of the mother, as the court shall order, and providing that the person charged by the mother to be the father, shall be adjudged to be the reputed father, upon her continuing constant in the charge, especially being put upon the discovery of the truth, in the time of her travail . . . ."

Because paternity statutes derogated from the common law and thus created the right of action, statutes of limitations within them were considered substantive and jurisdictional.[8] It can no longer be said, however, that the right of action in Connecticut in paternity suits does not derive from the common law. The common law is generally described as "those principles, usage, and rules of action applicable to the government and security of persons and property which do not rest for their authority upon any express and positive declaration of the will of the legislature." *Bishop* v. *United States,* 334 F. Sup. 415, 418 (S.D. Tex. 1971); see *State* v. *Muolo,* 118 Conn. 373, 378, 172 A. 875 (1934); *Beardsley* v. *Hartford,* 50 Conn. 529, 541 (1883). The United States Supreme Court in *Gomez* v. *Perez,* 409 U.S. 535, 93 S. Ct. 872, 35 L. Ed.2d 56 (1973), added to the common law its holding that "once a State posits a judicially enforceable right on behalf of children to needed support from their natural fathers there is no constitutionally sufficient justification for denying such an essential right to a child simply because its natural father has not married its mother." Id., 538. Thus, because the father's obligation to support his minor

---

[8] Illustrative of this point is the case of *Staples* v. *Staples,* 41 L.T. 347 (1879), discussed in A. Lieck, Lushington's Law of Affiliation and Bastardy—With Statutes, Notes, Forms, etc. (5th Ed. 1928), p. 9, wherein the English court addressed an issue involving the twelve month statute of limitations within the Bastardy Laws Amendment Act, 1872: "A bastard child having been born on November 3rd, 1877, application for an affiliation order was made by the mother on October 11th, 1878, and the summons was heard and dismissed for want of corroborative evidence on October 25th, 1878. On the same October 25th, after the justices had left the court-house, the mother applied to justices' clerk at his office for a second summons, alleging that further corroborative evidence was forthcoming . . . . [B]ut in consequence of the justice to whom such original application was made not attending the court, a second summons was not issued till November 6th, 1878. [The court held] that the respondent's second application not having been made to the justice himself until November 6th, 1878, it was too late, and the justice had no jurisdiction in the matter."

legitimate child is created at common law; *White* v. *White,* 138 Conn. 1, 5, 81 A.2d 450 (1951); *Bohun* v. *Kinasz,* 124 Conn. 543, 546, 200 A. 1015 (1938); his similar obligation after *Gomez* to support his minor illegitimate child is now derivatively based upon common law.

Because our paternity statute no longer is the sole basis for a paternity action, the statute of limitations it contains is not substantive or jurisdictional, but rather procedural or personal. It follows that such a statute of limitations may properly be applied retrospectively absent the clear expression of a contrary legislative intent, unless considerations of good sense and justice dictate otherwise. No such contrary intent appears either in the wording of the amended statute, or in the proceedings that disclose its legislative history. Nor does it appear that retroactive application of the new statute of limitations would work an injustice on the defendant. If we were to hold that the amendment was inapplicable to this action, which was pending at the time of the enactment; see General Statutes § 1-1 (u); the plaintiff would not be barred from commencing a new paternity action until 1996, when her child will reach his eighteenth birthday. Accordingly, we hold that the new eighteen year limitation upon the initiation of paternity actions prescribed by Public Acts 1985, No. 85-548, § 3, is to be applied retroactively to the defendant.

## II

The defendant's second claim is that the trial court erred in concluding that blood grouping and HLA test results are admissible to establish paternity. General Statutes § 46b-168 states that the results of blood grouping tests "shall be admissible in evidence only in cases where such results establish definite exclusion of the putative father . . . ." When the state offered

in evidence the report of the laboratory that had performed the tests upon the defendant, the mother and the child, the defendant objected that, since the report did not exclude his paternity, the statute barred the admission of the test results. The court overruled the objection and an exception was noted. We must, therefore, address the issue of whether HLA tests are blood grouping tests within the meaning of § 46b-168. A preliminary discussion of some of the scientific principles and procedures involved in paternity testing is necessary to explain our legal conclusions.

Gregor Mendel, the nineteenth century anchorite who crossed peas, discovered that hereditary particles from each parent, which are members of pairs, segregate in forming reproductive cells and then recombine in the offspring. Blood types are inherited according to the Mendelian laws that genes determine inherited characteristics, occur in pairs on chromosomes, and that one gene of the pair is inherited from the father while the other is inherited from the mother. See Peterson, "A Few Things You Should Know About Paternity Tests (But Were Afraid To Ask)," 22 Santa Clara L. Rev. 667, 669–70 (1982). If one knows the blood group (the phenotype) of a child, mother, and alleged father, one can infer the genes giving rise to that blood group (the genotype) and say whether a child with the observed phenotype could have been born to the mother and putative father. For example, a child having the phenotype A could not have been born to parents who are homozygous for the gene B (i.e., both parents have the genotype BB). See Lee, "Current Status of Paternity Testing," 9 Fam. L.Q. 615, 616–21 (1975). In such a case, the nonpaternity of the putative father having the genotype BB is established.

Courts have allowed the use of blood tests in paternity litigation for the last half century. Exclusion of paternity has traditionally been the primary consider-

ation. See, e.g., *Beach* v. *Beach,* 114 F.2d 479, 480 (D.C. Cir. 1940) ("[t]he value of blood grouping tests as proof of non-paternity is well known"); *Cortese* v. *Cortese,* 10 N.J. Super. 152, 157, 76 A.2d 717 (1950) ("[b]lood tests can now disprove paternity in over one-half of the paternity cases involving innocent men"). The use of blood test results had been necessarily restricted in this way because at one time only a few antigens, which are molecules that are genetic markers and that can be detected on the surface of cells, were known. Consequently, only a few basic blood group systems, all being red cell antigen systems, could be tested. For example, a positive test result under the early ABO system would mean merely that the accused was one of the 87 percent of the male population not excluded as the potential father. Positive test results under the ABO, Rh, and MNSs systems cumulatively, which tests are commonly referred to as the Landsteimer series of red cell blood grouping tests, would mean that the alleged father was one of the 45.5 percent of the male population having the requisite genotypes. See generally "Joint AMA-ABA Guidelines: Present Status of Serologic Testing in Problems of Disputed Parentage," 10 Fam. L.Q. 247 (1976); McCormick, Evidence (3d Ed. 1984), pp. 617–22.[9]

Genetic technology has advanced substantially in recent years. The probability of exclusion of parenthood on the basis of the combined use of several red cell antigen systems has increased to 65 percent and 73 percent for black and white individuals, respectively. P. Tishler, "Genetic Technology and the Solution of Crime," in Genetics and the Law II (A. Milunsky, G. Annas eds. 1979), pp. 284–85. In addition, the recent

---

[9] The ABO, Rh, and MNSs systems were the basic blood group systems used for testing in Connecticut in 1957, when General Statutes § 46b-168 was enacted. See General Law Committee, Hearing Conn. Joint Standing Committee Hearings, General Law Pt. 2 1957 Sess., p. 724.

discovery of the HLA system, present in cells throughout the body, has given rise to HLA testing for tissue compatibility in the context of organ transplants. Because of the "extreme diversity" of HLA types in humans, from which it follows that "the HLA types of virtually all individuals are rare"; id., 286; the impetus arose to use HLA data as evidence *for* paternity. See id., 286–87; Terasaki, "Resolution By HLA Testing of 1000 Paternity Cases Not Excluded By ABO Testing," 16 J. Fam. L. 543 (1978).

Despite the name "leucocyte antigen," the factors expressed by the HLA genes are present in most cells. J. Barrett, Textbook of Immunology (3d Ed. 1978), pp. 386–87. Blood cells are the easiest cells to obtain for HLA testing. "The HLA antigens occur in the white blood cells as well as in the tissue cells. Therefore, tissue typing for these antigens is done in the membranes of lymphocytes that have been separated from the person's blood." A. Guyton, Textbook of Medical Physiology (7th Ed. 1986), p. 75. However, an individual's HLA type is not related to his blood type. "HLA testing can be thought of as tissue typing rather than blood group typing." Ellman & Kaye, "Probabilities and Proof: Can HLA and Blood Group Testing Prove Paternity?," 54 N.Y.U. L. Rev. 1131, 1139 (1979).

In accordance with these considerations, we conclude that HLA tests are not blood grouping tests within the meaning of General Statutes § 46b-168. See also *Commonwealth* v. *Beausoleil,* 397 Mass. 206, 213, 490 N.E.2d 788 (1986) ("[w]e are convinced by our review of the case law from other jurisdictions as well as the available scientific and medicolegal commentary that the HLA system is not a blood grouping test, but is a tissue typing system"); *Cutchember* v. *Payne,* 466 A.2d 1240, 1241–42 (D.C. 1983) (HLA test is not a blood test within the statutory meaning, but a tissue test for which blood is merely a convenient testing medium).

Nor do we believe that the combination of HLA tests and red cell tests, which may increase the probability of excluding a wrongly accused father to over 99 percent; see Peterson, supra, 671; falls within § 46b-168's ambit. "The results, produced by combining HLA tests with the Landsteimer test or series of tests, are no longer those of blood grouping but rather a hybrid not specifically excluded by the plain and unambiguous language of § 46b-168." *Miller* v. *Miller,* 40 Conn. Sup. 66, 69, 481 A.2d 428 (1984); see also *Commonwealth* v. *Beausoleil,* supra, 213 n.10.

Our conclusion that HLA tests are not blood grouping tests within the meaning of the statute is supported by the legislative history of the adoption of § 46b-168. The legislative records indicate that the relatively low exclusion capability of the Landsteimer series strongly influenced the legislature to include the prohibition against using the test results affirmatively. Norman Solanch, a serologist, speaking at the hearings in 1957, said that the reason for the restriction upon the admissibility of blood grouping tests "is very simple. At the present time, we cannot prove that an individual is the father, but in cases where an individual is wrongly accused we can exclude him with the groupings here that are presently available in a little over 50 percent of the cases." General Law Committee, Hearing on Public Acts 1957, No. 367, April 4, 1957, p. 724. From this testimony, it appears unlikely that the 1957 legislature intended its statute to prohibit the admission in evidence of test results obtained by then unknown techniques such as HLA testing capable of achieving a decidedly higher probability of exclusion.[10]

---

[10] That the Committee on Judiciary of the General Assembly earlier this year discussed and allowed to die without a vote a proposed bill that would have, inter alia, allowed blood grouping and tissue typing test results into evidence in certain circumstances does not dissuade us from our conclusions. See Committee on Judiciary, Hearings on Raised Committee Bill No. 6054, "An Act Concerning Proof of Paternity," March 24, 1986. The rea-

Because the defendant's objection to the introduction of the laboratory report was solely upon the ground we have rejected that § 46b-168 prohibited admission of the test results for the purpose of establishing paternity, we need not consider whether the report was admissible under general common law rules pertaining to the use of evidence derived from recently developed scientific techniques. A party is limited to the ground of his objection in claiming error in a ruling on evidence. *Salvatore* v. *Hayden,* 144 Conn. 437, 443, 133 A.2d 622 (1957); see *Brown* v. *Connecticut Light & Power Co.,* 145 Conn. 290, 141 A.2d 634 (1958). The prevailing standard for judicial recognition of the probative value of scientific evidence has been carefully delineated in *Frye* v. *United States,* 293 F. 1013 (D.C. App. 1923): "Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." Id., 1014. This court has used the *Frye* standard in appraising the admissibility of evidence derived from innovative scientific techniques. See, e.g., *State* v. *Tomanelli,* 153 Conn. 365, 370, 216 A.2d 625 (1966) ("general scientific acceptance of the Doppler-shift principle upon which police radar operates"); cf. *Molino* v. *Board of Public Safety,* 154 Conn. 368, 376, 225 A.2d 805 (1966) ("unreliability of the polygraph test has resulted in its universal rejection").

sons for the proposed bill's demise are not pellucid, and therefore such demise cannot be seen as the basis for a clear inference on the question of legislative intent. Further, the Committee's distinction between blood grouping tests and tissue typing tests bolsters our own interpretation of the current statute, namely, that the restriction it places on the use of blood grouping tests does not also restrict the use of tissue typing tests.

We note that combined blood grouping and HLA testing has attained general acceptance in the scientific community as a means of testing for paternity. See, e.g., J. Barrett, supra; Joint AMA-ABA Guidelines: Present Status of Serologic Testing in Problems of Disputed Parentage, supra; Lee, supra; Peterson, supra; Terasaki, supra; P. Tishler, supra. "The American Medical Association, the American Association of Blood Banking, and the American Association of Histocompatibility have all approved HLA testing to determine paternity. See *Haines* v. *Shanholtz,* 57 Md. App. 92, 100 [468 A.2d 1365] (1984). Moreover, while there is some disagreement among medicolegal commentators as to how inculpatory HLA test results should be presented to the fact finder in paternity cases, nearly all agree that such evidence is reliable and should be admitted in one form or another." *Commonwealth* v. *Beausoleil,* supra, 215–16. It also appears that the decided trend in other jurisdictions is toward admission of HLA test results as evidence of paternity. See, e.g., *Cramer* v. *Morrison,* 88 Cal. App. 3d 873, 153 Cal. Rptr. 865 (1979); *Carlyon* v. *Weeks,* 387 So. 2d 455, 467 (Fla. App. 1980); *Crain* v. *Crain,* 104 Idaho 666, 662 P.2d 538 (1983); *Commonwealth* v. *Beausoleil,* supra; *Hennepin County Welfare Board* v. *Ayers,* 304 N.W.2d 879 (Minn. 1981); *Owens* v. *Bell,* 6 Ohio St. 3d 46, 53, 451 N.E.2d 241 (1983).

The state did produce an expert witness who testified concerning the scientific principles supporting the reliability of the test results and who had supervised the testing procedures used in this case. The defendant produced no expert witnesses. His cross-examination of the state's expert did touch upon some of the deficiencies in the assumptions used in the probability theorem employed to calculate the 99.6 percent likelihood of paternity that the laboratory report indicated. We cannot conclude, however, from review-

ing the trial transcript that the issue of judicial acceptance of the results of combined blood grouping and HLA testing as establishing the probability of paternity was fully litigated in the trial court, presumably because of the absence of an objection to such evidence on that ground. This case also presents no occasion for discussion of some of the problems related to the manner of presentation of statistical probability of paternity that may arise, especially in jury cases. See *Commonwealth* v. *Beausoleil*, supra, 220. Accordingly, we limit our holding on this aspect of the case to the conclusion that the admissibility of the results from the combined blood grouping and HLA testing is not precluded by § 46b-168.

Although we hold that the trial court correctly construed General Statutes § 46b-168 not to bar the inclusive use of blood grouping and HLA test results, we address two final concerns. First, a possible reading of the trial court's memorandum of decision is that it used the results of the HLA and blood grouping tests to find that the named parties had sexual intercourse. That memorandum states in part: "The Court after having heard all of the testimony, *and after a review of the exhibits,* finds that the Plaintiff has proven that, during the period in question, the Petitioner Sharon Moore was a single woman and that the child in question was conceived on March 4, 1978 at the Defendant's apartment *when the Petitioner and the Defendant engaged in sexual relations.*"[11] (Emphasis added.) The plaintiff's Exhibit A was Dr. Silver's report, in which he calculated that the likelihood of the defendant's paternity is 99.6 percent. Because this probability calculation was based upon an assumption of sexual intercourse during the period of conception,[12] its use in proving

---

[11] See footnote 3, supra.

[12] The probability of paternity was calculated by the use of Bayes' Theorem which is a basic formula of probability theory. The formula makes two assumptions: (1) that the mother of the child had intercourse with the

intercourse would be incorrect. In the present case, however, the defendant admitted on examination by the court that he and the plaintiff mother had engaged in sexual intercourse on the date in question.[18] Because this admission was sufficient evidence of intercourse, such an impermissible use of the test results is not at issue today.

Our final concern is whether applying the results of the HLA and blood grouping tests to show paternity may be unfair with respect to this defendant. The defendant moved for a court order pursuant to General Statutes § 46b-168 requiring that he, the mother, and the child submit to blood tests. Probably, the defendant believed that the results of these tests would be admissible in evidence only to establish that he was not the father. Nevertheless, even were we to find the defendant's interpretation of the statute reasonable, the fact that § 46b-168 allows the court to order blood tests on motion of *any party* would render futile a decision not to apply the test results to the defendant. At

defendant during the possible period of conception and (2) that the mother also had intercourse with another male during that period. It then describes the way test results would influence a completely rational decisionmaker's evaluation of the probability of paternity. See Lempert, "Modeling Relevance," 75 Mich. L. Rev. 1021, 1022–25 (1977). The formula postulates that the prior probability of paternity should be revised according to a fraction whose denominator is the likelihood of positive test results if the defendant is the father (100 percent), and whose numerator is the probability of positive results if the alleged father is not the biological father. Ellman & Kaye, "Probabilities and Proof: Can HLA and Blood Group Testing Prove Paternity," 54 N.Y.U. L. Rev. 1131, 1148 (1979).

[18] The relevant examination by the court went as follows:

"The Court: Mr. McNamara, on the stand [Miss Moore] indicated that you had sex with her.

"The Witness: Yes.

"The Court: She also indicated that you had sex with her on March 4th at a mortgage burning party?

"The Witness: Yes.

"The Court: Did you have sex with her on March 4th?

"The Witness: Yes."

the next trial, the plaintiff would be able to move for a further round of blood tests, and then to have the results admitted into evidence.[14] Therefore, the court did not err in applying the results of the HLA and blood grouping tests to this defendant.

There is no error.

In this opinion the other justices concurred.

[14] In the recent case *Commonwealth* v. *Beausoleil,* 397 Mass. 206, 490 N.E.2d 788 (1986), the Massachusetts Supreme Judicial Court ruled that HLA test results are admissible to establish paternity, notwithstanding an exclusionary statute closely paralleling our General Statutes § 46b-168. The *Beausoleil* court declined to apply its decision retroactively to the defendant, who had requested that the HLA blood test be performed. *Beausoleil,* supra, 222. Unlike our statute, however, the Massachusetts statute mandates that the court shall order blood tests on the motion of the alleged father only. See *Beausoleil,* supra, 211 (quoting Mass. Gen. Laws. ch. 273, § 12A).