BELL ATLANTIC MOBILE, INC. *v.* DEPARTMENT OF PUBLIC UTILITY CONTROL ET AL.
(SC 16147)

McDonald, C. J., and Borden, Norcott, Palmer and Sullivan, Js.

Argued January 18—officially released June 13, 2000

*Dina S. Fisher*, with whom, on the brief, was *David W. Bogan*, for the appellant (plaintiff).

*Tatiana D. Eirmann*, assistant attorney general, with whom, on the brief, was *Richard Blumenthal*, attorney general, for the appellee (named defendant).

*Jennifer L. Emma* filed a brief for the state office of consumer counsel as amicus curiae.

BORDEN, J. The plaintiff, Bell Atlantic Mobile, Inc., is a commercial mobile radio service provider licensed by the Federal Communications Commission (commission), to provide cellular service in Connecticut. The plaintiff appeals[1] from the judgment of the trial court dismissing its administrative appeal from a decision of the named defendant, the department of public utility control (department), concerning universal telephone service contributions. The plaintiff claims that the trial court improperly concluded that: (1) federal law does not preempt General Statutes § 16-247e[2] to the extent

[1] The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c).

[2] General Statutes § 16-247e provides: "Basic telecommunications services. Lifeline program. Universal service program. (a) In order to ensure the universal availability of affordable, high quality telecommunications services to all residents and businesses throughout the state regardless of income, disability or location, the department shall (1) periodically investigate and determine, after notice and hearing, local service options, including the definition and components of any basic telecommunications services, necessary to achieve universal service and meet customer needs; and (2) establish a lifeline program funded by all telecommunications carriers that provide intrastate telecommunications services, as such terms are defined in 47 USC 153, as amended from time to time, sufficient to provide low-income households or individuals with a level of telecommunications service or package of telecommunications services that supports participation in the economy and society of the state. The department shall apportion the funding for the lifeline program among telecommunications carriers on an equitable basis based on the gross revenues of each telecommunications carrier that are generated in Connecticut, both interstate and intrastate. The lifeline program shall be administered by an entity authorized, and subject to oversight, by the department. The department shall determine by order which customers qualify for the lifeline program. Recipients of lifeline funds shall use such funds to pay for telecommunications services provided by any telecommunications carrier.

"(b) The department may, if necessary, establish a universal service program, funded by all telecommunications companies or users in the state on an equitable basis, as determined by the department, to ensure the universal availability of affordable, high quality basic telecommunications services to all residents and businesses throughout the state regardless of location. Any funds contributed to a universal service program shall be used to support

that it requires commercial mobile radio service providers to contribute to the state universal service program; (2) the assessment methodology employed pursuant to § 16-247e does not violate federal law; and (3) § 16-247e does not have an unlawful discriminatory effect among commercial mobile radio service providers such as the plaintiff. We disagree with the plaintiff's claims and, accordingly, we affirm the judgment of the trial court.

A brief review of the relevant historical development of the statutory and regulatory framework governing telecommunications is necessary to an understanding of this case. In the mid-1970s, pursuant to the federal Communications Act of 1934; 47 U.S.C. § 151 et seq.; the commission allocated certain radio frequencies for the development of cellular telephone service. The commission anticipated licensing one cellular telephone system, operated by the local telephone company, in each local market. In the 1980s, however, as a result of increased demand and in order to promote competition, the commission decided to increase the spectrum allocation, and subsequently divided it between two competing cellular carriers in each market. See *Connecticut Dept. of Public Utility Control* v. *Federal Communications Commission*, 78 F.3d 842, 845 (2d Cir. 1996).

Prior to 1993, the Communications Act of 1934 distinguished between "common carrier" service and "private carrier" service, the former of which was much more regulated than the latter. Common carriers were subject to both federal and state regulation, whereas private carriers generally were not. This, coupled with the way in which the commission defined "private carrier" service, created the possibility of generally unregulated private carriers directly competing with heavily regulated common carriers. See generally Second Report

the availability of basic telecommunications services provided by any telecommunications company in a manner to be determined by the department."

and Order, Implementation of Sections 3 (n) and 332 of the Communications Act, 9 F.C.C.R. 1411, 1414–16 (1994) (Second Report); *Connecticut Dept. of Public Utility Control* v. *Federal Communications Commission*, supra, 78 F.3d 845. Although private carriers and common carriers had become virtually indistinguishable, they were subject to differing regulatory schemes. H.R. Rep. No. 103-111, 103rd Cong., 1st Sess. 261 (1993), reprinted in 1993 U.S.C.C.A.N. 378, 586–87.

As part of the Omnibus Budget Reconciliation Act of 1993 (Budget Act); Pub. L. No. 103-66, 107 Stat. 312 (1993), codified in relevant part at 47 U.S.C. § 332 (c); Congress amended the Communications Act of 1934 to revise the regulation of the wireless telecommunications industry, which encompasses cellular telephone service. Congress had two principal objectives in amending 47 U.S.C. § 332: (1) to ensure that similar mobile services are subject to consistent regulatory treatment; and (2) to impose only the level of regulation necessary to promote competition and protect mobile communications customers. Second Report, supra, 9 F.C.C.R. 1418; see also H.R. Rep. No. 103-111, 103rd Cong., 1st Sess. 261 (1993), reprinted in 1993 U.S.C.C.A.N. 378, 586–87.

The 1993 amendments to 47 U.S.C. § 332 created new statutory classifications of "commercial" and "private" mobile radio services. Second Report, supra, 9 F.C.C.R. 1417. Commercial mobile radio service is defined as "any mobile service . . . that is provided for profit and makes interconnected service available (A) to the public or (B) to such classes of eligible users as to be effectively available to a substantial portion of the public, as specified by regulation by the Commission."[3] 47

---

[3] "Interconnected service" is defined as "service that is interconnected with the public switched network (as such terms are defined by regulation by the Commission) or service for which a request for interconnection is pending pursuant to subsection (c) (1) (B) of this section." 47 U.S.C. § 332 (d) (2) (1994).

U.S.C. § 332 (d) (1) (Sup. II 1996). Private mobile radio service is defined as "any mobile service . . . that is not a commercial mobile service or the functional equivalent of a commercial mobile service, as specified by regulation by the Commission." 47 U.S.C. § 332 (d) (3) (Sup. II 1996).

Allowing private mobile radio service to remain unregulated, Congress amended 47 U.S.C. § 332 in order to establish a new federal regulatory scheme for commercial mobile radio service. Section 332 also, however, provides a general preemption of state regulation for both private mobile radio service and commercial mobile radio service: "[N]o State or local government shall have any authority to regulate the entry of or the rates charged by any commercial mobile service or any private mobile service . . . ." 47 U.S.C. § 332 (c) (3) (A). The objective of the preemption provision was to preclude state regulatory practices that would conflict with the objectives of § 332 either by impairing the regulatory parity between commercial mobile radio service and private mobile radio service created by § 332 or by otherwise unnecessarily burdening competition. Second Report, supra, 9 F.C.C.R. 1413, 1421.

Under certain circumstances, however, a state may petition the commission for permission to regulate the rates for commercial mobile radio service. Section 332 (c) (3) (A) provides that state rate regulation is appropriate when: (1) market conditions have failed to protect subscribers adequately from unjust and unreasonable commercial mobile radio service rates or commercial mobile radio service rates that are unjustly or unreasonably discriminatory; or (2) such conditions exist and commercial mobile radio service is a replacement for land line telephone exchange service for a substantial portion of such service within the state. 47 U.S.C. § 332 (c) (3) (A); Second Report, supra, 9 F.C.C.R. 1505.

As part of the Telecommunications Act of 1996; Pub. L. No. 104-104, 110 Stat. 56 (1996), codified in relevant part at 47 U.S.C. §§ 253 and 254;[4] Congress enacted

[4] Title 47 of the United States Code, § 254 (Sup. II 1996), provides: "Universal service

"(a) Procedures to review universal service requirements

"(1) Federal-State Joint Board on universal service

"Within one month after February 8, 1996, the Commission shall institute and refer to a Federal-State Joint Board under section 410 (c) of this title a proceeding to recommend changes to any of its regulations in order to implement sections 214 (e) of this title and this section, including the definition of the services that are supported by Federal universal service support mechanisms and a specific timetable for completion of such recommendations. In addition to the members of the Joint Board required under section 410 (c) of this title, one member of such Joint Board shall be a State-appointed utility consumer advocate nominated by a national organization of State utility consumer advocates. The Joint Board shall, after notice and opportunity for public comment, make its recommendations to the Commission 9 months after February 8, 1996.

"(2) Commission action

"The Commission shall initiate a single proceeding to implement the recommendations from the Joint Board required by paragraph (1) and shall complete such proceeding within 15 months after February 8, 1996. The rules established by such proceeding shall include a definition of the services that are supported by Federal universal service support mechanisms and a specific timetable for implementation. Thereafter, the Commission shall complete any proceeding to implement subsequent recommendations from any Joint Board on universal service within one year after receiving such recommendations.

"(b) Universal service principles

"The Joint Board and the Commission shall base policies for the preservation and advancement of universal service on the following principles:

"(1) Quality and rates

"Quality services should be available at just, reasonable, and affordable rates.

"(2) Access to advanced services

"Access to advanced telecommunications and information services should be provided in all regions of the Nation.

"(3) Access in rural and high cost areas

"Consumers in all regions of the Nation, including low-income consumers and those in rural, insular, and high cost areas, should have access to telecommunications and information services, including interexchange services and advanced telecommunications and information services, that are reasonably comparable to those services provided in urban areas and that are available at rates that are reasonably comparable to rates charged for similar services in urban areas.

"(4) Equitable and nondiscriminatory contributions

"All providers of telecommunications services should make an equitable and nondiscriminatory contribution to the preservation and advancement of universal service.

"(5) Specific and predictable support mechanisms

"There should be specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service.

"(6) Access to advanced telecommunications services for schools, health care, and libraries

"Elementary and secondary schools and classrooms, health care providers, and libraries should have access to advanced telecommunications services as described in subsection (h) of this section.

"(7) Additional principles

"Such other principles as the Joint Board and the Commission determine are necessary and appropriate for the protection of the public interest, convenience, and necessity and are consistent with this chapter.

"(c) Definition

"(1) In general

"Universal service is an evolving level of telecommunications services that the Commission shall establish periodically under this section, taking into account advances in telecommunications and information technologies and services. The Joint Board in recommending, and the Commission in establishing, the definition of the services that are supported by Federal universal service support mechanisms shall consider the extent to which such telecommunications services—

"(A) are essential to education, public health, or public safety;

"(B) have, through the operation of market choices by customers, been subscribed to by a substantial majority of residential customers;

"(C) are being deployed in public telecommunications networks by telecommunications carriers; and

"(D) are consistent with the public interest, convenience, and necessity.

"(2) Alterations and modifications

"The Joint Board may, from time to time, recommend to the Commission modifications in the definition of the services that are supported by Federal universal service support mechanisms.

"(3) Special services

"In addition to the services included in the definition of universal service under paragraph (1), the Commission may designate additional services for such support mechanisms for schools, libraries, and health care providers for the purposes of subsection (h) of this section.

"(d) Telecommunications carrier contribution

"Every telecommunications carrier that provides interstate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, to the specific, predictable, and sufficient mechanisms established by the Commission to preserve and advance universal service. The Commission

## 1934. The 1996 amendments, which deregulated the

may exempt a carrier or class of carriers from the requirement if the carrier's telecommunications activities are limited to such an extent that the level of such carrier's contribution to the preservation and advancement of universal service would be de minimis. Any other provider of interstate telecommunications may be required to contribute to the preservation and advancement of universal service if the public interest so requires.

"(e) Universal service support

"After the date on which Commission regulations implementing this section take effect, only an eligible telecommunications carrier designated under section 214 (e) of this title shall be eligible to receive specific Federal universal service support. A carrier that receives such support shall use that support only for the provision, maintenance, and upgrading of facilities and services for which the support is intended. Any such support should be explicit and sufficient to achieve the purposes of this section.

"(f) State authority

"A State may adopt regulations not inconsistent with the Commission's rules to preserve and advance universal service. Every telecommunications carrier that provides intrastate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, in a manner determined by the State to the preservation and advancement of universal service in that State. A State may adopt regulations to provide for additional definitions and standards to preserve and advance universal service within that State only to the extent that such regulations adopt additional specific, predictable, and sufficient mechanisms to support such definitions or standards that do not rely on or burden Federal universal service support mechanisms.

"(g) Interexchange and interstate services

"Within 6 months after February 8, 1996, the Commission shall adopt rules to require that the rates charged by providers of interexchange telecommunications services to subscribers in rural and high cost areas shall be no higher than the rates charged by each such provider to its subscribers in urban areas. Such rules shall also require that a provider of interstate interexchange telecommunications services shall provide such services to its subscribers in each State at rates no higher than the rates charged to its subscribers in any other State.

"(h) Telecommunications services for certain providers

"(1) In general

"(A) Health care providers for rural areas

"A telecommunications carrier shall, upon receiving a bona fide request, provide telecommunications services which are necessary for the provision of health care services in a State, including instruction relating to such services, to any public or nonprofit health care provider that serves persons who reside in rural areas in that State at rates that are reasonably comparable to rates charged for similar services in urban areas in that State. A telecommunications carrier providing service under this paragraph shall be entitled to have an amount equal to the difference, if any, between the rates for

entire telecommunications industry, were designed "to

services provided to health care providers for rural areas in a State and the rates for similar services provided to other customers in comparable rural areas in that State treated as a service obligation as a part of its obligation to participate in the mechanisms to preserve and advance universal service.

"(B) Educational providers and libraries

"All telecommunications carriers serving a geographic area shall, upon a bona fide request for any of its services that are within the definition of universal service under subsection (c) (3) of this section, provide such services to elementary schools, secondary schools, and libraries for educational purposes at rates less than the amounts charged for similar services to other parties. The discount shall be an amount that the Commission, with respect to interstate services, and the States, with respect to intrastate services, determine is appropriate and necessary to ensure affordable access to and use of such services by such entities. A telecommunications carrier providing service under this paragraph shall—

"(i) have an amount equal to the amount of the discount treated as an offset to its obligation to contribute to the mechanisms to preserve and advance universal service, or

"(ii) notwithstanding the provisions of subsection (e) of this section, receive reimbursement utilizing the support mechanisms to preserve and advance universal service.

"(2) Advanced services

"The Commission shall establish competitively neutral rules—

"(A) to enhance, to the extent technically feasible and economically reasonable, access to advanced telecommunications and informations services for all public and nonprofit elementary and secondary school classrooms, health care providers, and libraries; and

"(B) to define the circumstances under which a telecommunications carrier may be required to connect its network to such public institutional telecommunications users.

"(3) Terms and conditions

"Telecommunications services and network capacity provided to a public institutional telecommunications user under this subsection may not be sold, resold, or otherwise transferred by such user in consideration for money or any other thing of value.

"(4) Eligibility of users

"No entity listed in this subsection shall be entitled to preferential rates or treatment as required by this subsection, if such entity operates as a for-profit business, is a school described in paragraph (5) (A) with an endowment of more than $50,000,000, or is a library or library consortium not eligible for assistance from a State library administrative agency under the Library Services and Technology Act [20 U.S.C. § 9121 et seq.].

"(5) Definitions

"For purposes of this subsection:

"(A) Elementary and secondary schools

promot[e] competition and reduc[e] regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid development of new telecommunications technologies." H.R. Rep. No. 104-204, 104th Cong., 2d Sess. 47 (1995), reprinted in 1996 U.S.C.C.A.N. 10, 11.

The Telecommunications Act of 1996 added a new section to the Communications Act of 1934, entitled

---

"The term 'elementary and secondary schools' means elementary schools and secondary schools, as defined in paragraphs (14) and (25), respectively, of section 8801 of Title 20.

"(B) Health care provider

"The term 'health care provider' means—

"(i) post-secondary educational institutions offering health care instruction, teaching hospitals, and medical schools;

"(ii) community health centers or health centers providing health care to migrants;

"(iii) local health departments or agencies;

"(iv) community mental health centers;

"(v) not-for-profit hospitals;

"(vi) rural health clinics; and

"(vii) consortia of health care providers consisting of one or more entities described in clauses (i) through (vi).

"(C) Public institutional telecommunications user

"The term 'public institutional telecommunications user' means an elementary or secondary school, a library, or a health care provider as those terms are defined in this paragraph.

"(i) Consumer protection

"The Commission and the States should ensure that universal service is available at rates that are just, reasonable, and affordable.

"(j) Lifeline Assistance

"Nothing in this section shall affect the collection, distribution, or administration of the Lifeline Assistance Program provided for by the Commission under regulations set forth in section 69.117 of title 47, Code of Federal Regulations, and other related sections of such title.

"(k) Subsidy of competitive services prohibited

"A telecommunications carrier may not use services that are not competitive to subsidize services that are subject to competition. The Commission, with respect to interstate services, and the States, with respect to intrastate services, shall establish any necessary cost allocation rules, accounting safeguards, and guidelines to ensure that services included in the definition of universal service bear no more than a reasonable share of the joint and common costs of facilities used to provide those services."

"Universal Service." 47 U.S.C. § 254. Prior to 1996, universal service programs consisted of external subsidies, namely, payments between companies, and internal subsidies, namely, the subsidized provision of service to high cost subscribers by low cost subscribers. H.R. Rep. No. 104-204, 104th Cong., 2d Sess. 66 (1995), reprinted in 1996 U.S.C.C.A.N. 10, 31. This provision, 47 U.S.C. § 254, was enacted because Congress anticipated that the market created by the other amendments would make internal subsidies less viable, in that deregulation would remove providers' ability to subsidize high cost customers through rates charged to low cost customers. H.R. Rep. No. 104-204, 104th Cong., 2d Sess. 67–68 (1995), reprinted in 1996 U.S.C.C.A.N. 10, 33.

Subsections (d) and (f) of § 254 of title 47 of the United States Code (Sup. II 1996) set forth the scope of universal service requirements. Subsection (d) of § 254 provides in pertinent part: "Every telecommunications carrier that provides interstate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, to the specific, predictable, and sufficient mechanisms established by the Commission to preserve and advance universal service. . . ." The federal universal service program was created pursuant to this provision. State universal service programs, however, fall within the ambit of subsection (f) of § 254, which specifically provides: "A State may adopt regulations not inconsistent with the Commission's rules to preserve and advance universal service. Every telecommunications carrier that provides intrastate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, in a manner determined by the State to the preservation and advancement of universal service in that State. A State may adopt regulations to provide for additional definitions and standards to preserve and advance universal service within that State only to the extent that such

regulations adopt additional specific, predictable, and sufficient mechanisms to support such definitions or standards that do not rely on or burden Federal universal service support mechanisms."[5]

Subsection (a) of § 254 directed the commission to convene a federal-state joint board to make recommendations regarding the preservation and advancement of universal telecommunications services at affordable rates to all Americans. 47 U.S.C. § 254 (a); see also H.R. Rep. No. 104-204, 104th Cong., 2d Sess. 128 (1995), reprinted in 1996 U.S.C.C.A.N. 10, 139. In developing universal service programs, the joint board was to be guided by the six principles set forth by new subsection (b) of § 254.[6] One of those principles provides that "[a]ll providers of telecommunications services should make an equitable and nondiscriminatory contribution to the preservation and advancement of universal service." 47 U.S.C. § 254 (b) (4).

In 1997, pursuant to the recommendations of the Federal-State Joint Board, the commission issued a final rule reforming the federal universal service program. In the Matter of Federal-State Joint Board on Universal Service, Report and Order (CC Docket No. 96-45), 12 F.C.C.R. 8776 (1997) (universal service decision). In its order, the commission stated: "Lifeline service should be provided to low-income consumers in every state, irrespective of whether the state provides matching funds . . . ." Id., 8952. The commission order recognized the responsibility of both state and federal governments to preserve and advance universal service. Id., 8954.

---

[5] The commission has explicitly determined that commercial mobile radio service providers are "telecommunications carriers" within the meaning of the 1996 amendments. See First Report and Order, Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, 11 F.C.C.R. 15,499, 15,517 (1996).

[6] See footnote 4 of this opinion for the text of 47 U.S.C. § 254.

In 1994, by Public Acts 1994, No. 94-83, §§ 5 and 16, now codified at § 16-247e, the Connecticut General Assembly had adopted legislation to ensure the universal availability of affordable telecommunications services.[7] Pursuant to § 16-247e (a), as amended by No. 97-121 of the 1997 Public Acts, the department is required to "establish a lifeline program funded by all telecommunications carriers that provide intrastate telecommunications services, as such terms are defined in 47 USC 153 . . . sufficient to provide low-income households or individuals with a level of telecommunications service or package of telecommunications services that supports participation in the economy and society of the state. The department shall apportion the funding for the lifeline program among telecommunications carriers on an equitable basis based on the gross revenues of each telecommunications carrier that are generated in Connecticut, both interstate and intrastate. . . ." General Statutes § 16-247e (a) (2). Pursuant to the mandate in § 16-247e (a), and in light of the commission's universal service decision, the department issued its final decision; see Department of Public Utility Control, Review of the Connecticut Lifeline Program, Docket No. 97-07-12 (March 25, 1998) pp. 3, 4, 30, 33 (lifeline decision); in which it ordered that all telecommunications providers, including commercial mobile radio service providers, were obligated pursuant to § 16-247e, as amended by No. 97-121 of the 1997 Public Acts, to contribute to the state lifeline program according to their intrastate and interstate gross revenues subject to Connecticut sales tax.

The plaintiff appealed from the lifeline decision to the Superior Court pursuant to General Statutes §§ 16-

---

[7] Initially, mandatory participation in the state's lifeline program applied solely to Connecticut's three local exchange carriers. See Dept. of Public Utility Control, Review of the Connecticut Lifeline Program, Docket No. 97-07-12 (March 25, 1998) p. 21.

35[8] and 4-183.[9] The plaintiff claimed that: (1) federal

---

[8] General Statutes § 16-35 provides: "Appeals to Superior Court. (a) Any person, including but not limited to a company, town, city, borough or corporation aggrieved by any order, authorization or decision of the Department of Public Utility Control, except an order, authorization or decision of the department approving the taking of land, in any matter to which such person was or ought to have been made a party or intervenor, may appeal therefrom in accordance with the provisions of section 4-183. Such person so appealing shall give bond to the state, with sufficient surety, for the benefit of the adverse party, in such sum as the department fixes, to pay all costs in case such person fails to sustain such appeal. No municipality or political subdivision shall be determined not to be aggrieved solely because there are other persons who are similarly affected by the order, authorization or decision of the department.

"(b) Any person who may appeal an order, authorization or decision of the department under subsection (a) of this section who was an intervenor or, after timely application, was denied intervenor status to the department proceeding, shall be limited to raise on appeal only those issues that (1) such person addressed during the proceeding or were addressed in the final decision or (2) such person raised in his request for intervenor status if he was denied intervenor status."

[9] General Statutes § 4-183 provides: "Appeal to Superior Court. (a) A person who has exhausted all administrative remedies available within the agency and who is aggrieved by a final decision may appeal to the Superior Court as provided in this section. The filing of a petition for reconsideration is not a prerequisite to the filing of such an appeal.

"(b) A person may appeal a preliminary, procedural or intermediate agency action or ruling to the Superior Court if (1) it appears likely that the person will otherwise qualify under this chapter to appeal from the final agency action or ruling and (2) postponement of the appeal would result in an inadequate remedy.

"(c) Within forty-five days after mailing of the final decision under section 4-180 or, if there is no mailing, within forty-five days after personal delivery of the final decision under said section, a person appealing as provided in this section shall serve a copy of the appeal on the agency that rendered the final decision at its office or at the office of the Attorney General in Hartford and file the appeal with the clerk of the superior court for the judicial district of Hartford or for the judicial district wherein the person appealing resides or, if that person is not a resident of this state, with the clerk of the court for the judicial district of Hartford. Within that time, the person appealing shall also serve a copy of the appeal on each party listed in the final decision at the address shown in the decision, provided failure to make such service within forty-five days on parties other than the agency that rendered the final decision shall not deprive the court of jurisdiction over the appeal. Service of the appeal shall be made by (1) United States mail, certified or registered, postage prepaid, return receipt requested, without the

law preempts the department's imposition of universal

use of a sheriff or other officer, or (2) personal service by a proper officer or indifferent person making service in the same manner as complaints are served in ordinary civil actions.

"(d) The person appealing, not later than fifteen days after filing the appeal, shall file or cause to be filed with the clerk of the court an affidavit, or the sheriff's return, stating the date and manner in which a copy of the appeal was served on each party and on the agency that rendered the final decision, and, if service was not made on a party, the reason for failure to make service. If the failure to make service causes prejudice to any party to the appeal or to the agency, the court, after hearing, may dismiss the appeal.

"(e) If service has not been made on a party, the court, on motion, shall make such orders of notice of the appeal as are reasonably calculated to notify each party not yet served.

"(f) The filing of an appeal shall not, of itself, stay enforcement of an agency decision. An application for a stay may be made to the agency, to the court or to both. Filing of an application with the agency shall not preclude action by the court. A stay, if granted, shall be on appropriate terms.

"(g) Within thirty days after the service of the appeal, or within such further time as may be allowed by the court, the agency shall transcribe any portion of the record that has not been transcribed and transmit to the reviewing court the original or a certified copy of the entire record of the proceeding appealed from, which shall include the agency's findings of fact and conclusions of law, separately stated. By stipulation of all parties to such appeal proceedings, the record may be shortened. A party unreasonably refusing to stipulate to limit the record may be taxed by the court for the additional costs. The court may require or permit subsequent corrections or additions to the record.

"(h) If, before the date set for hearing on the merits of an appeal, application is made to the court for leave to present additional evidence, and it is shown to the satisfaction of the court that the additional evidence is material and that there were good reasons for failure to present it in the proceeding before the agency, the court may order that the additional evidence be taken before the agency upon conditions determined by the court. The agency may modify its findings and decision by reason of the additional evidence and shall file that evidence and any modifications, new findings, or decisions with the reviewing court.

"(i) The appeal shall be conducted by the court without a jury and shall be confined to the record. If alleged irregularities in procedure before the agency are not shown in the record or if facts necessary to establish aggrievement are not shown in the record, proof limited thereto may be taken in the court. The court, upon request, shall hear oral argument and receive written briefs.

"(j) The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court shall affirm the decision of the agency unless the court finds that substantial rights

service assessments on commercial mobile radio service providers; (2) § 16-247e has an inequitable, discriminating and unlawful effect on commercial mobile radio service providers; and (3) § 16-247e violates the separation of powers provision of article second of the Connecticut constitution. The trial court rejected the plaintiff's claims and affirmed the decision of the department. This appeal followed.

Before reaching the plaintiff's claims, we briefly address the applicable standard of review. "The standard of review of an agency decision is well established. Ordinarily, this court affords deference to the construc-

of the person appealing have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) In violation of constitutional or statutory provisions; (2) in excess of the statutory authority of the agency; (3) made upon unlawful procedure; (4) affected by other error of law; (5) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. If the court finds such prejudice, it shall sustain the appeal and, if appropriate, may render a judgment under subsection (k) of this section or remand the case for further proceedings. For purposes of this section, a remand is a final judgment.

"(k) If a particular agency action is required by law, the court, on sustaining the appeal, may render a judgment that modifies the agency decision, orders the particular agency action, or orders the agency to take such action as may be necessary to effect the particular action.

"(*l*) In all appeals taken under this section, costs may be taxed in favor of the prevailing party in the same manner, and to the same extent, that costs are allowed in judgments rendered by the Superior Court. No costs shall be taxed against the state, except as provided in section 4-184a.

"(m) In any case in which a person appealing claims that he cannot pay the costs of an appeal under this section, he shall, within the time permitted for filing the appeal, file with the clerk of the court to which the appeal is to be taken an application for waiver of payment of such fees, costs and necessary expenses, including the requirements of bond, if any. The application shall conform to the requirements prescribed by rule of the judges of the Superior Court. After such hearing as the court determines is necessary, the court shall render its judgment on the application, which judgment shall contain a statement of the facts the court has found, with its conclusions thereon. The filing of the application for the waiver shall toll the time limits for the filing of an appeal until such time as a judgment on such application is rendered."

tion of a statute applied by the administrative agency empowered by law to carry out the statute's purposes. . . . [A]n agency's factual and discretionary determinations are to be accorded considerable weight by the courts. . . . Cases that present pure questions of law, however, invoke a broader standard of review than is ordinarily involved in deciding whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion. . . . Furthermore, when a state agency's determination of a question of law has not previously been subject to judicial scrutiny . . . the agency is not entitled to special deference. . . . [I]t is for the courts, and not administrative agencies, to expound and apply governing principles of law. . . . *Connecticut Light & Power Co.* v. *Texas-Ohio Power, Inc.*, 243 Conn. 635, 642–43, 708 A.2d 202 (1998)." (Internal quotation marks omitted.) *Connecticut Assn. of Not-for-Profit Providers for the Aging* v. *Dept. of Social Services*, 244 Conn. 378, 389, 709 A.2d 1116 (1998).

To the extent that the commission's interpretation of the relevant federal statutes is implicated, we set out the analytical framework in which we give deference to a federal agency's interpretation of federal statutes. Although it is not controlling, the interpretation of a federal agency is entitled to substantial deference. *Chevron U.S.A., Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844–45, 104 S. Ct. 2778, 81 L. Ed. 2d 694, reh. denied, 468 U.S. 1227, 105 S. Ct. 28, 82 L. Ed. 2d 921 (1984) (*Chevron*). The *Chevron* analysis requires us first to determine "whether the intent of Congress is clear as to the precise question at issue. . . . If, by employing traditional tools of statutory construction . . . we determine that Congress' intent is clear, that is the end of the matter . . . ." (Citations omitted; internal quotation marks omitted.) *Regions Hospital* v. *Shalala*, 522 U.S. 448, 457, 118 S. Ct. 909,

139 L. Ed. 2d 895 (1998); *Chevron,* supra, 842–43. "If a statute's meaning is plain, the [agency that administers the program] and reviewing courts must give effect to the unambiguously expressed intent of Congress." (Internal quotation marks omitted.) *Holly Farms Corp.* v. *National Labor Relations Board,* 517 U.S. 392, 398, 116 S. Ct. 1396, 134 L. Ed. 2d 593 (1996); *Chevron,* supra, 842–43. This is step one review under *Chevron.*

Step two review under *Chevron* informs us that: "[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute. . . . If the agency's reading fills a gap or defines a term in a reasonable way in light of [Congressional] design, we give that reading controlling weight, even if it is not the answer the court would have reached if the question initially had arisen in a judicial proceeding." (Citation omitted; internal quotation marks omitted.) *Regions Hospital* v. *Shalala,* supra, 522 U.S. 457; *Chevron,* supra, 467 U.S. 843. "[W]e must sustain the [agency's] approach so long as it is based on a permissible construction of the statute." (Internal quotation marks omitted.) *Auer* v. *Robbins,* 519 U.S. 452, 457, 117 S. Ct. 905, 137 L. Ed. 2d 79 (1997); *Chevron,* supra, 843. "When the legislative prescription is not free from ambiguity . . . [c]ourts . . . must respect the judgment of the agency empowered to apply the law to varying fact patterns . . . even if the issue with nearly equal reason [might] be resolved one way rather than another . . . ." (Citations omitted; internal quotation marks omitted.) *Holly Farms Corp.* v. *National Labor Relations Board,* supra, 517 U.S. 398–99.

"We accord deference to agencies under *Chevron,* not because of a presumption that they drafted the provisions in question, or were present at the hearings, or spoke to the principal sponsors; but rather because

of a presumption that Congress, when it left ambiguity in a statute meant for implementation by an agency, understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows." *Smiley* v. *Citibank (South Dakota), N.A.*, 517 U.S. 735, 740–41, 116 S. Ct. 1730, 135 L. Ed. 2d 25 (1996); *Chevron*, supra, 467 U.S. 843–44. "Judicial deference to an agency's interpretation of ambiguous provisions of the statutes it is authorized to implement reflects a sensitivity to the proper roles of the political and judicial branches." *Pauley* v. *BethEnergy Mines, Inc.*, 501 U.S. 680, 696, 111 S. Ct. 2524, 115 L. Ed. 2d 604 (1991).

I

The plaintiff first claims that federal law preempts § 16-247e "to the extent it may be construed to authorize the [department] to assess [commercial mobile radio service] providers such as [the plaintiff] for lifeline contributions, and expressly preempts the [department] from imposing lifeline funding requirements on [commercial mobile radio service] providers such as [the plaintiff]." Specifically, the plaintiff argues that 47 U.S.C. § 332 (c) (3) (A) "expressly preclude[s] states from assessing cellular carriers for funding for universal service programs *unless* the [commercial mobile radio service] carrier provided a substitute for [land line] services (i.e., basic home telephone service) for a substantial portion of the state." (Emphasis in original.)

The department concedes that it has never found wireless service to be a substitute for land line service in Connecticut. The department contends, however, that such a finding is not required because 47 U.S.C. § 254 (f) expressly authorizes states to assess all telecommunications providers, including commercial mobile radio service providers, for contributions to the states' univer-

sal service programs. The department also contends that 47 U.S.C. § 332 (c) (3) (A) preempts only state regulation of the entry of and the rates charged by commercial mobile radio service providers, and that such preemption does not apply to the department's assessments against the plaintiff for universal service funding. Additionally, the department argues that the substitutability condition contained in § 332 (c) (3) (A) does not apply to universal service funding assessments. We agree with the department.

"The question of preemption is one of federal law, arising under the supremacy clause of the United States constitution. . . . Determining whether Congress has exercised its power to preempt state law is a question of legislative intent. . . . Express preemption occurs to the extent that a federal statute expressly directs that state law be ousted to some degree from a certain field. . . . *Dowling* v. *Slotnik*, 244 Conn. 781, 791, 712 A.2d 396, cert. denied [sub nom. *Slotnik* v. *Considine*,] 525 U.S. 1017, 119 S. Ct. 542, 142 L. Ed. 2d 451 (1998). Even when there is no express preemption, any proper application of the doctrine must give effect to the intent of Congress. *New York Telephone Co.* v. *New York State Dept. of Labor*, 440 U.S. 519, 540, 99 S. Ct. 1328, 59 L. Ed. 2d 553 (1979), citing *Malone* v. *White Motor Corp.*, 435 U.S. 497, 504, 98 S. Ct. 1185, 55 L. Ed. 2d 443 (1978)." (Internal quotation marks omitted.) *Church Homes, Inc.* v. *Administrator, Unemployment Compensation Act*, 250 Conn. 297, 308–309, 735 A.2d 805 (1999).

This issue presents a question of statutory interpretation. "The process of statutory interpretation involves a reasoned search for the intention of the legislature. *Frillici* v. *Westport*, 231 Conn. 418, 431, 650 A.2d 557 (1994). In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of this case, including the question of whether the language actually does apply. In

seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. . . . Id.; *Carpenteri-Waddington, Inc.* v. *Commissioner of Revenue Services*, 231 Conn. 355, 362, 650 A.2d 147 (1994); *United Illuminating Co.* v. *Groppo*, 220 Conn. 749, 755–56, 601 A.2d 1005 (1992)." (Internal quotation marks omitted.) *Bortner* v. *Woodbridge*, 250 Conn. 241, 258–59, 736 A.2d 104 (1999).

Against the historical backdrop described previously, we must determine whether federal law precludes the department from imposing universal funding requirements on the plaintiff, which is a commercial mobile radio service provider. We begin with the statutory language at issue. Although this issue requires our analysis of several statutory provisions, our starting point is title 47 of the United States Code, § 332 (c) (3) (A), which was enacted as part of the Budget Act of 1993.[10] The

[10] Title 47 of the United States Code, § 332 (c) (3) (A), provides:

"[1] Notwithstanding sections 152 (b) and 221 (b) of this title, no State or local government shall have any authority to regulate the entry of or the rates charged by any commercial mobile service or any private mobile service, except that this paragraph shall not prohibit a State from regulating the other terms and conditions of commercial mobile services. [2] Nothing in this subparagraph shall exempt providers of commercial mobile services (where such services are a substitute for land line telephone exchange service for a substantial portion of the communications within such State) from requirements imposed by a State commission on all providers of telecommunications services necessary to ensure the universal availability of telecommunications services at affordable rates. [3] Notwithstanding the first sentence of this subparagraph, a State may petition the Commission for authority to regulate the rates for any commercial mobile service and the Commission shall grant such petition if such State demonstrates that—

"(i) market conditions with respect to such services fail to protect subscribers adequately from unjust and unreasonable rates or rates that are unjustly or unreasonably discriminatory; or

"(ii) such market conditions exist and such service is a replacement for land line telephone exchange service for a substantial portion of the telephone land line exchange service within such State.

first sentence of 47 U.S.C. § 332 (c) (3) (A) sets forth a general prohibition against the regulation by states of "the entry of or the rates charged by" commercial mobile radio service and private mobile radio service providers. The first sentence also expressly provides, however, that states may regulate "the other terms and conditions" of commercial mobile radio service.[11] The second sentence of 47 U.S.C. § 332 (c) (3) (A) then begins with language of exception, namely: "Nothing in this subparagraph shall exempt [commercial mobile radio service] providers . . . ." By this language, the second sentence carves out an exception to the general prohibition contained in the first sentence. Specifically, the second sentence of § 332 (c) (3) (A) allows states to impose requirements on commercial mobile radio service providers in order to ensure universal availability of telephone service, under the condition set forth by the parenthetical contained therein, namely, the substitutability condition—"where [commercial mobile radio] services are a substitute for land line telephone exchange service for a substantial portion of the communications within such State . . . ."[12] Read in the con-

"The Commission shall provide reasonable opportunity for public comment in response to such petition, and shall, within 9 months after the date of its submission, grant or deny such petition. If the Commission grants such petition, the Commission shall authorize the State to exercise under State law such authority over rates, for such periods of time, as the Commission deems necessary to ensure that such rates are just and reasonable and not unjustly or unreasonably discriminatory."

For ease of reference, we have numbered the first three sentences of 47 U.S.C. § 332 (c) (3) (A).

[11] The department argues that the phrase "other terms and conditions" contained in 47 U.S.C. § 332 (c) (3) (A) includes universal service funding requirements. The plaintiff, however, argues that the second sentence of § 332 (c) (3) (A) assumes that a universal service contribution constitutes rate regulation.

[12] The substitutability condition exists where commercial mobile radio service functions, not as an alternative to regular telephone service, but as a replacement for regular telephone service. H.R. Conf. Rep. No. 103-213, 103rd Cong., 1st Sess. 493 (1993), reprinted in 1993 U.S.C.C.A.N. 1088, 1182.

text of the first sentence, the second sentence does not preempt any state regulation, but rather confers additional authority upon the states—authority that would otherwise be prohibited by the first sentence. Finally, the third sentence of § 332 (c) (3) (A) provides that a state may petition the commission for permission to regulate the rates for any commercial mobile radio service provider, and that such petition shall be granted, provided that the state demonstrates that: (1) market conditions have not protected subscribers from rates that are unjust and unreasonable, or rates that are unjustly and unreasonably discriminatory; or (2) such market conditions exist and commercial mobile radio service serves as a substitute for land line service for a substantial portion of the state.

We next construe the language of title 47 of the United States Code, § 254 (f) (Sup. II 1996), enacted as part of the Telecommunications Act of 1996, which provides: "A State may adopt regulations not inconsistent with the Commission's rules to preserve and advance universal service. Every telecommunications carrier that provides intrastate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, in a manner determined by the State to the preservation and advancement of universal service in that State. A State may adopt regulations to provide for additional definitions and standards to preserve and advance universal service within that State only to the extent that such regulations adopt additional specific, predictable, and sufficient mechanisms to support such definitions or standards that do not rely on or burden Federal universal service support mechanisms."

Also, as part of the Telecommunications Act of 1996, Congress enacted 47 U.S.C. § 601 (c) (1), which provides: "This Act and the amendments made by this Act shall not be construed to modify, impair, or supersede Federal, State, or local law unless expressly so provided

in such Act or amendments." We therefore must construe 47 U.S.C. § 254 (f) in a manner that does not "modify, impair, or supersede" 47 U.S.C. § 332 (c) (3) (A).

By its language, 47 U.S.C. § 254 (f) expressly authorizes states to establish regulations in order to ensure the universal availability of telephone service within each state. Section 254 (f) provides that state programs may require universal service contributions from "[e]very telecommunications carrier that provides intrastate telecommunications services," and that they may do so to the extent that the state funding mechanisms "do not rely on or burden" federal funding mechanisms. There is no language in § 254 (f) to suggest that commercial mobile radio service providers are not encompassed by the provision's application to "[e]very telecommunications carrier . . . ." Similarly, there is no indication that the provision should be construed to "modify, impair, or supersede" 47 U.S.C. § 332 (c) (3) (A). Our reading of § 254 (f) does not conflict with § 332 (c) (3) (A), and therefore is consistent with the directive in 47 U.S.C. § 601 (c) to construe the statute in a manner that does not "modify, impair, or supersede" federal law.

We next look to the legislative history of the relevant statutes. There is nothing in the legislative history of the statutory scheme to support the argument that 47 U.S.C. § 332 (c) (3) (A) prohibits states from imposing universal service funding assessments on commercial mobile radio service providers unless they satisfy the substitutability condition. To the contrary, the legislative history supports our conclusion that federal law does not preempt states' imposition of such assessments.

Although the terms "rates," "entry" and "other terms and conditions," as used in 47 U.S.C. § 332 (c) (3) (A),

are not statutorily defined, the legislative history of § 332 (c) (3) (A) suggests that universal service funding regulation is encompassed by the phrase "other terms and conditions" and, therefore, may be regulated by the states in the absence of a substitutability showing. The most explicit legislative statement on this issue is located in the House Report, which states that "[b]y 'terms and conditions,' the Committee intends to include such matters as customer billing information and practices and billing disputes and other consumer protection matters; facilities siting issues (e.g., zoning); transfers of control; the bundling of services and equipment; and the requirement that carriers make capacity available on a wholesale basis or such other matters as fall within a state's lawful authority. This list is intended to be illustrative only and not meant to preclude other matters generally understood to fall under 'terms and conditions.'" H.R. Rep. No. 103-111, 103rd Cong., 1st Sess. 261 (1993), reprinted in 1993 U.S.C.C.A.N. 378, 588.

The expressly listed matters, given only as examples, undermine the plaintiff's argument that universal service contribution assessments constitute rate or entry regulation.[13] State regulation of many of the listed items—for example, wholesale capacity requirements—may have an indirect impact on the entry of or the rates charged by a commercial mobile radio service

---

[13] The plaintiff relies on *Westmarc Communications, Inc.* v. *Connecticut Dept. of Public Utility Control*, 807 F. Sup. 876, 887 (D. Conn. 1990), in which the federal District Court concluded that federal law preempted a department order that prohibited a cable television company from charging back to its customers fines levied against it by the department. The court reasoned that such an order would affect customer rates and, therefore, would be "indistinguishable from a rate-making regulation." Id., 886. Reliance on that decision is misplaced. The department order in that case specifically prohibited the company from passing certain costs through to their customers. More importantly, however, the legislative history of the statute at issue in the present case does not support the analogy.

provider, in that they may result in additional costs of doing business to the provider that might be passed on to the customer. The legislative history suggests, however, that that fact does not convert a regulation of what would generally be understood to be a term or condition of doing business into rate or entry regulation. Similarly, the fact that universal service funding requirements may have an indirect effect on rates does not require, or even suggest, the conclusion that such a program constitutes state rate regulation. To conclude that any state requirement that may increase the cost of doing business constitutes rate regulation would prohibit virtually all state regulation in this area, and would therefore negate the effect of the "other terms and conditions" language of the first sentence of 47 U.S.C. § 332 (c) (3) (A).

The legislative history of 47 U.S.C. § 254 also gives us some guidance. The House Report explicitly describes universal service contribution requirements as a "condition for doing business." H.R. Rep. No. 104-204, 104th Cong., 2d Sess. 69 (1995), reprinted in 1996 U.S.C.C.A.N. 10, 34. We read this to suggest that such requirements are more appropriately characterized as "terms and conditions" for providing service rather than as rate or entry regulation, and hence are not within the scope of 47 U.S.C. § 332 (c) (3) (A) preemption.

The House Report, the Senate Report and the House Conference Report all suggest that Congress believed that universal service requirements for commercial mobile radio service providers are not preempted by 47 U.S.C. § 332 (c) (3) (A). The House Report explicitly states that, in enacting 47 U.S.C. § 254, Congress intended that "*all* telecommunications carriers would participate in the provision and advancement of universal service." (Emphasis added.) H.R. Rep. No. 104-204, 104th Cong., 2d Sess. 68 (1995), reprinted in 1996 U.S.C.C.A.N. 10, 33–34. Although other sections of the

legislative history; see, e.g., H.R. Rep. No. 104-204, 104th Cong., 2d Sess. 126–27 (1995), reprinted in 1996 U.S.C.C.A.N. 10, 93–94; address differential treatment of commercial mobile radio service providers whose services have not been found to be a substitute for land line telephone exchange service for a substantial portion of communications within a state, no reference is made to a preexisting exemption for those providers pursuant to § 332 (c) (3) (A) with respect to state universal service requirements. This suggests that Congress did not believe that such an exemption existed. The Senate Report states that the Telecommunications Act of 1996 "establishes a new section . . . to clearly articulate the policy of Congress that universal service is a cornerstone of the Nation's communications system. This new section is intended to make explicit the current implicit authority of the [commission] *and the States* to require common carriers to provide universal service." (Emphasis added.) S. Rep. No. 104-23, 104th Cong., 1st Sess. 25 (1995). The House Conference Report notes that "[a] state may adopt *any measure* with respect to universal service that is not inconsistent with the Commission's [universal service] rules." (Emphasis added.) H.R. Conf. Rep. No. 104-458, 104th Cong., 2d Sess. 132 (1996), reprinted in 1996 U.S.C.-C.A.N. 124, 143. This suggests that all measures, as opposed to only those measures that exempt certain commercial mobile radio service providers, consistent with those rules are within the authority retained by the states. This legislative history supports our conclusion that § 16-247e, as implemented by the department's lifeline decision, is not violative of the federal statutory and regulatory framework set forth primarily by § 332 (c) (3) (A) and the 1996 amendments.

Furthermore, both the Federal-State Joint Board and the commission have rejected the plaintiff's preemption

argument.[14] The commission expressly adopted the interpretation of the Federal-State Joint Board, that 47 U.S.C. § 332 (c) (3) (A) "does not preclude states from requiring [commercial mobile radio service] providers to contribute to state support mechanisms." *Federal-State Joint Board on Universal Service, Report and Order,* 12 F.C.C.R. 8776, 9181–82 (1997). The commission later reaffirmed its position. *In the Matter of Petition of Pittencrieff Communications, Inc.,* 13 F.C.C.R. 1735, 1737 (1997), aff'd sub nom. *Cellular Telecommunications Industry Assn.* v. *Federal Communications Commission,* 168 F.3d 1332 (D.C. Cir. 1999). The commission adopted rules allowing states to require cellular providers to contribute to universal service programs. The commission's report and orders that promulgate those rules rejected the claim that such requirements established pursuant to 47 U.S.C. § 254 (f) conflict with 47 U.S.C. § 332 (c) (3) (A). See generally 47 C.F.R. §§ 36, 54 and 69 (1999).

Furthermore, all of the other appellate courts that have construed 47 U.S.C. § 332 (c) (3) (A) have held that it does not preempt states from requiring commercial mobile radio service participation in state universal service programs. See *Texas Office of Public Utility Counsel* v. *Federal Communications Commission,* 183 F.3d 393, 431 (5th Cir. 1999), cert. denied sub nom. *Celpage, Inc.* v. *Federal Communications Commission,* United

---

[14] Having employed our well established tools of statutory interpretation, for purposes of *Chevron* review, we conclude that Congress' intent is clear as to whether states may impose universal service contributions on commercial mobile radio service providers absent a finding that such providers served as a substitute to land line telephone service for a substantial portion of the state. We therefore do not engage in step two review under *Chevron,* as described previously. See *Texas Office of Public Utility Counsel* v. *Federal Communications Commission,* 183 F.3d 393, 409 (5th Cir. 1999), cert. denied sub nom. *Celpage, Inc.* v. *Federal Communications Commission,* United States Supreme Court, Docket No. 99-1072 (May 30, 2000) (applying step one review); but see *Sprint Spectrum* v. *State Corp. Commission of Kansas,* 149 F.3d 1058, 1061 (10th Cir. 1998) (applying step two review).

States Supreme Court, Docket No. 99-1072 (May 30, 2000); *Mountain Solutions, Inc.* v. *State Corp. Commission of Kansas*, 966 F. Sup. 1043, 1049 (D. Kan. 1997), aff'd sub nom. *Sprint Spectrum* v. *State Corp. Commission of Kansas*, 149 F.3d 1058, 1061 (10th Cir. 1998); *In the Matter of Petition of Pittencrieff Communications, Inc.*, supra, 13 F.C.C.R. 1737.

The plaintiff does not dispute that the only case in which a court has construed 47 U.S.C. § 332 (c) (3) (A) in the manner that it suggests is *Metro Mobile CTS of Fairfield County, Inc.* v. *Dept. of Public Utility Control*, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. CV 950051275S (December 11, 1996), appeal dismissed, 243 Conn. 235, 702 A.2d 1179 (1997). The court in *Metro Mobile CTS of Fairfield County, Inc.*, concluded, as the plaintiff here urges us to do, that the second sentence of § 332 (c) (3) (A) assumes that universal service assessments are not among "the other terms and conditions" of cellular service. Id. Otherwise, according to the Superior Court, the second sentence is redundant. Id. Accordingly, the court held that the Budget Act preempted the department from assessing cellular providers for universal service contributions. Id. Simply put, we are not persuaded by the reasoning of the Superior Court in that case.

We next address the specific arguments advanced by the plaintiff. The plaintiff argues that the second sentence assumes that universal service assessments constitute regulation, and that our interpretation of 47 U.S.C. § 332 (c) (3) (A) violates the so-called canon of statutory construction that all statutory language must be given effect. According to the plaintiff, if we conclude that universal service requirements are encompassed by the clause "other terms and conditions," then the second sentence would be redundant. Stated another way, according to the plaintiff, it would serve no pur-

pose to provide in the second sentence that commercial mobile radio service providers are not exempt from universal service funding requirements only when the substitutability condition is satisfied if states already may impose such requirements pursuant to the first sentence.

As stated previously, however, the second sentence of 47 U.S.C. § 332 (c) (3) (A) provides an exception to the general prohibition in the first sentence against state regulation of rates and entry. The second sentence allows state rate regulation in the name of universal availability when cellular service serves as a substantial substitute to land line service, whereas the clause "other terms and conditions" encompasses universal service contribution requirements under any circumstance. Therefore, states may regulate the terms and conditions of providing cellular service. States may regulate the entry of and the rates charged by commercial mobile radio service providers, in order to ensure universal service, when cellular service serves as a substantial substitute for land line service. The second sentence confers authority that the states would otherwise be prohibited from exercising under the first sentence. Our construction of § 332 (c) (3) (A), therefore, does not result in redundant language.

The plaintiff also relies on § 152 (b) of 47 U.S.C., also referred to as § 2 (b) of the Communications Act of 1934, which provides in relevant part: "Except as provided in . . . section 332 of this title . . . nothing in this chapter shall be construed to apply or to give the Commission jurisdiction with respect to (1) charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service by wire or radio of any carrier . . . ." The plaintiff argues that this provision, as amended by the Budget Act, "further underscore[s] federal preemption of any State authority over cellular communications,"

while maintaining states' jurisdictionally intrastate authority over intrastate communications matters. In this connection, the plaintiff contends that, by virtue of the reference to 47 U.S.C. § 332 in 47 U.S.C. § 152 (b), the exemption includes state laws regarding "charges, classifications, practices, services, facilities or regulations." We are unpersuaded. Section 152 (b) of 47 U.S.C. explicitly imposes jurisdictional limitations on the power of the commission and says nothing about the jurisdiction of the states. See *AT&T Corp.* v. *Iowa Utilities Board*, 525 U.S. 366, 380, 119 S. Ct. 721, 142 L. Ed. 2d 834 (1999); *Louisiana Public Service Commission* v. *Federal Communications Commission*, 476 U.S. 355, 371–76, 106 S. Ct. 1890, 90 L. Ed. 2d 369 (1986). There is no reason, at least in this instance, to interpret a statute, which by its terms expressly limits only federal authority, to prohibit state regulation as well.

The plaintiff also relies on 47 U.S.C. § 253 (e), which provides: "Nothing in this section shall affect the application of section 332 (c) (3) of this title to commercial mobile service providers." The plaintiff argues that this provision "expressly preserves the preemption provisions of the Budget Act. Congress has therefore precluded any interpretation of the [Telecommunications] Act that might undercut the general preemptive effect of the Budget Act's language." This argument, however, does not alter our conclusion that the department's order is not preempted by § 332 (c) (3) (A). Because 47 U.S.C. § 332 (c) (3) (A) does not preempt the department's order, and we must construe the Telecommunications Act pursuant to 47 U.S.C. § 601 (c), it is not then preempted by 47 U.S.C. § 253 (e).

The plaintiff also argues that 47 U.S.C. § 254 (f), which provides that states may establish universal service funds, applies only to commercial mobile radio service providers when the substitutability condition of 47 U.S.C. § 332 (c) (3) (A) has been satisfied. The plaintiff

conceded at oral argument before this court that its § 254 argument depended on the viability of its § 332 (c) (3) (A) argument. Because we reject the plaintiff's § 332 argument, we accordingly reject its argument based on § 254 (f).

In sum, we conclude that federal law does not preempt the department from imposing universal service contribution assessments on commercial mobile radio service providers. In so doing, we conclude that the phrase "other terms and conditions" contained in 47 U.S.C. § 332 (c) (3) (A), which states may regulate without having to satisfy the substitutability condition, encompasses universal service funding requirements.

## II

The plaintiff next claims that, even if the substitutability condition does not apply to the department's imposition of universal funding requirements on commercial mobile radio service providers, § 16-247e violates federal law because it permits the department to exact contributions based in part on interstate revenues. The department responds that the plaintiff did not properly raise this issue before the trial court and, therefore, may not seek review of this issue on appeal.

We have stated repeatedly that we ordinarily will not review an issue that has not been properly raised before the trial court. See, e.g., *Santopietro* v. *New Haven*, 239 Conn. 207, 219–20, 682 A.2d 106 (1996) (court "not required to consider any claim that was not properly preserved in the trial court"); *Yale University* v. *Blumenthal*, 225 Conn. 32, 36 n.4, 621 A.2d 1304 (1993) (court declined to consider issues briefed on appeal but not raised at trial); see also Practice Book § 60-5 ("court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial"). We agree in part with the department. Because we perceive the plaintiff's claim to be two distinct claims, we consider them in turn.

The plaintiff's principal argument is that federal law precludes the lifeline assessment from being based on the interstate revenues of commercial mobile radio service providers because states only have jurisdiction over intrastate telecommunications and, therefore, may only base the assessment on intrastate revenues. A thorough review of its briefs filed in the administrative proceedings and the trial court, however, reveals that at no point did the plaintiff even functionally make; see *State* v. *Dabkowski*, 199 Conn. 193, 198, 506 A.2d 118 (1986); this particular argument. Instead, in its trial brief, the plaintiff argued that commercial mobile radio service is inherently interstate and, therefore, such providers are exempt from state universal service assessments in their entirety. We perceive that claim, however, to be distinct from the alternative claim that the plaintiff now makes, namely, that states only have the jurisdiction to base lifeline assessments on intrastate revenues, and that, therefore, only the plaintiff's intrastate revenues may be assessed for state lifeline contribution purposes.

In its reply brief, in defending against the department's assertion that the plaintiff's claim was not raised in the trial court, the plaintiff merely restates its first claim on appeal, namely, that states may not assess commercial mobile radio service providers for state lifeline programs unless they satisfy the substitutability condition of 47 U.S.C. § 332 (c) (3) (A). The plaintiff also argues that its argument is supported by *Texas Office of Public Utility Counsel* v. *Federal Communications Commission*, supra, 183 F.3d 393, a decision rendered after the trial court in the present case issued its judgment.[15] Neither of these arguments, however,

---

[15] In *Texas Office of Public Utility Counsel* v. *Federal Communication Commission*, supra, 183 F.3d 434, the court concluded that the commission may not base its *federal* universal service assessments on *intrastate* revenues. Contrary to the plaintiff's position, however, we are not persuaded that this necessarily means that a state may not base its *state* universal service assessments on, inter alia, *interstate* revenues.

refutes the fact that the claim was not made in the trial court. We therefore decline to consider it.

Second, the plaintiff makes, albeit in two sentences, what we perceive to be the distinct claim, namely, that § 16-247e would have "a discriminatory effect on [the plaintiff] and other cellular providers given that [commercial mobile radio service] providers already contribute to federal universal programs based on their interstate revenues. Taxing those revenues twice imposes an unfair and inequitable burden on interstate providers, considering that intrastate providers would not have borne the brunt of that double hit." We disagree.

With respect to whether this argument was made in the trial court, the plaintiff, in its brief to the department and in its trial brief, distinctly argued that § 16-247e is discriminatory against commercial mobile radio service providers, and therefore contrary to federal law, because it effects a double taxation in the manner described previously. We therefore consider the merits of this argument.

We perceive only two sources that may form the basis for the plaintiff's claim that federal law prohibits § 16-247e from having a discriminatory effect on commercial mobile radio service providers to the extent that the universal service assessment is based on interstate revenues: (1) federal statutory law; and (2) federal constitutional law. The plaintiff, however, in its brief, does not direct our attention to any federal statutory provision or any federal constitutional principle or provision, most notably, the commerce clause, to support its claim. In fact, at oral argument before this court, a question from the bench, expressly based on the understanding that there was no *constitutional* principle that prohibited mere double taxation, elicited a clarification of the plaintiff's claim on appeal. In response to the question,

the plaintiff's counsel stated: "We're not arguing that, in and of itself, a double hit is in some way unlawful. But rather, given the language of the statute in [§] 254 (f), which says that the state mechanism cannot burden the federal mechanism, there's implicit in the language of [§] 254, the idea that there is going to be a division between the funding for the state program on intrastate telecommunications and funding for interstate." We are unpersuaded.

We again first look to the controlling statutory language. Section 254 (f) of 47 U.S.C. (Sup. II 1996) states that "[a] State may adopt regulations not inconsistent with the Commission's rules to preserve and advance universal service. Every telecommunications carrier that provides intrastate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, in a manner determined by the State to the preservation and advancement of universal service in that State. A State may adopt regulations to provide for additional definitions and standards to preserve and advance universal service within that State only to the extent that such regulations adopt additional specific, predictable, and sufficient mechanisms to support such definitions or standards *that do not rely on or burden Federal universal service support mechanisms.*" (Emphasis added.)

As described previously, by its broad language, 47 U.S.C. § 254 (f) permits states to establish universal service funds and to require "[e]very telecommunications carrier that provides intrastate telecommunications services" to contribute to such funds. Section 254 (f) permits such a scheme so long as the state funding mechanisms "do not rely on or burden Federal universal service support mechanisms." Beyond its claim that the funds may not overlap in terms of its revenue base, the plaintiff has not claimed, nor is there any evidence in the record to establish, that the state funding mecha-

nisms have relied on or burdened the federal funding mechanisms under § 254 (d). Contrary to the plaintiff's position, merely because there may be an overlapping in terms of the revenues being assessed for both funds does not suggest that the *federal funding mechanisms* have been relied on or burdened in any way, which is what the statute prohibits. We therefore reject the plaintiff's claim.

## III

Finally, the plaintiff claims that the lifeline decision is contrary to federal law because its cost recovery mechanism imposes an inequitable burden on cellular providers, such as the plaintiff, and therefore it violates the mandate in 47 U.S.C. §§ 253 and 254 of the Telecommunications Act of 1996, which provides that state universal funding requirements must be "equitable and nondiscriminatory." The plaintiff directs our attention to two ways in which such a discriminatory effect may result. First, the plaintiff maintains, "[b]ecause the [department] does not regulate [commercial mobile radio service] providers, it does not know which providers are currently providing telecommunications in the state, and therefore its assessments for lifeline contributions will be discriminatory." The plaintiff asserts that, although the lifeline decision orders that "each telecommunications company providing service in Connecticut" contribute to the lifeline program, the decision does not specify how the department will identify providers required to participate. Second, according to the plaintiff, the department neither identifies nor assesses new commercial mobile radio service providers. The department, to the contrary, argues that the plaintiff has provided no evidence in the record to support its claim. In its memorandum of decision, the trial court stated that "[t]he plaintiff fail[ed] to support [its] discrimination claim with any reference to the record, which would demonstrate the inequitable impact on

[commercial mobile radio service] providers." We agree with the department and the trial court that the plaintiff failed to sustain its burden in establishing the factual underpinnings of this claim.

"In the absence of weighty countervailing circumstances, it is improvident for the court to invalidate a statute on its face." *Sassone* v. *Lepore*, 226 Conn. 773, 778, 629 A.2d 357 (1993); *Lehrer* v. *Davis*, 214 Conn. 232, 235, 571 A.2d 691 (1990); *Motor Vehicle Manufacturers Assn. of the United States, Inc.* v. *O'Neill*, 203 Conn. 63, 75, 523 A.2d 486 (1987). "[C]onstitutional issues do not exist in a vacuum. . . . The best teaching of this Court's experience admonishes us not to entertain constitutional questions in advance of the strictest necessity. *Parker* v. *Los Angeles*, 338 U.S. 327, 333, 70 S. Ct. 161, 94 L. Ed. 144 (1949). *Moore* v. *McNamara*, 201 Conn. 16, 21, 513 A.2d 660 (1986). . . . *Statewide Grievance Committee* v. *Whitney*, [227 Conn. 829, 844, 633 A.2d 296 (1993)]. A party mounting a constitutional challenge to the validity of a statute must provide an adequate factual record in order to meet its burden of demonstrating the statute's adverse impact on some protected interest of its own, in its own particular case, and not merely under some hypothetical set of facts as yet unproven. . . . We do not give advisory opinions, nor do we sit as roving commissions assigned to pass judgment on the validity of legislative enactments. Determination of the scope and constitutionality of legislation in advance of its immediate adverse effect in the context of a concrete case involves too remote and abstract an inquiry for the proper exercise of the judicial function. . . . *Lehrer* v. *Davis*, supra, 234–35; *International Longshoremen's & Warehousemen's Union, Local 37* v. *Boyd*, 347 U.S. 222, 224, 74 S. Ct. 447, 98 L. Ed. 650 (1954); see *Hall* v. *Gilbert & Bennett Mfg. Co.*, 241 Conn. 282, 306–307, 695 A.2d 1051 (1997)." (Internal

quotation marks omitted.) *Dowling* v. *Slotnik*, supra, 244 Conn. 817.

Mindful of these principles, we reject the plaintiff's claim that the statute has a disparate effect on certain commercial mobile radio service providers. The plaintiff refers to no evidence in the record to support its claim that the department's decision effects a disparate result. If we were to address this claim, we would do so in a factual vacuum. Our precedent "counsels against embarking on such an expedition in the absence of an adequate factual record. *Sassone* v. *Lepore*, supra, 226 Conn. 779; *Lehrer* v. *Davis*, supra, 214 Conn. 234–35; *Motor Vehicle Manufacturers Assn. of the United States, Inc.* v. *O'Neill*, supra, 203 Conn. 75 . . . ." (Citations omitted.) *Hall* v. *Gilbert & Bennett Mfg. Co.*, supra, 241 Conn. 308. We will not pass on the validity of a statute where the party alleging its invalidity, based on its alleged discriminatory result, has provided no evidence in the record to support such a proposition.

The judgment is affirmed.

In this opinion NORCOTT, PALMER and SULLIVAN, Js., concurred.

MCDONALD, C. J., concurring in part and dissenting in part. I agree with the majority's interpretation of 47 U.S.C. § 332 (c) (3) (A). I believe, however, that the portion of General Statutes § 16-247e that imposes an assessment on revenues from interstate telecommunications is inequitable and discriminatory in violation of 47 U.S.C. § 254 (f).[1] Furthermore, I believe that that portion of the statute potentially subjects revenues from interstate telecommunications to multistate taxation,

---

[1] Title 47 of the United States Code (Sup. II 1996), § 254 (f) provides in relevant part: "Every telecommunications carrier that provides intrastate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, in a manner determined by the State to the preservation and advancement of universal service in that State. . . ."

and that it therefore violates the commerce clause of the United States constitution. Accordingly, I would invalidate that portion of the statute. See *State* v. *Dupree*, 196 Conn. 655, 660, 495 A.2d 691, cert. denied, 474 U.S. 951, 106 S. Ct. 318, 88 L. Ed. 2d 301 (1985) (this court may declare portion of statute unconstitutional if statute is severable).

General Statutes § 16-247e (a) provides in relevant part: "The department shall apportion the funding for the lifeline program among telecommunications carriers on an equitable basis based on the gross revenues of each telecommunications carrier that are generated in Connecticut, *both interstate and intrastate.* . . ." (Emphasis added.) In *Texas Office of Public Utility Counsel* v. *Federal Communications Commission*, 183 F.3d 393 (5th Cir. 1999), the United States Court of Appeals for the Fifth Circuit Court ruled that the Federal Communications Commission (commission) had no authority to assess intrastate revenues in its calculation of universal service contributions pursuant to 47 U.S.C. § 254 (d).[2] Thus, Connecticut telecommunications providers that provide only intrastate services are not subject to any assessment by the commission, while providers of interstate services pay an assessment on their revenue from those services to both the state of Connecticut and the commission. Furthermore, as set forth more fully later in this dissenting opinion, the revenue from those services potentially could be subject to taxation in other states.[3] Subjecting revenues

[2] Title 47 of the United States Code (Sup. II 1996), § 254 (d) provides in relevant part: "Every telecommunications carrier that provides interstate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, to the specific, predictable, and sufficient mechanisms established by the Commission to preserve and advance universal service. . . ."

[3] It is worth noting, however, that, at this time, Connecticut is the *only* state that has expressly directed the regulatory agency responsible for administering its universal service program to assess revenues from interstate telecommunications to fund the program. See Alaska Stat. § 42.05.840 (Lexis Law Publishing 1998); Ariz. Rev. Stat. Ann. § 42-5252 (West 1997 Special

from interstate telecommunications to multiple taxation is, in my view, clearly inequitable and discriminatory against the providers of those services in violation of 47 U.S.C. § 254 (f).

I also believe that this assessment[4] violates the com-

Pamphlet, effective January 1, 1999); Ark. Code Ann. § 23-17-304 (Michie 1987); Cal. Pub. Util. Code Ann. §§ 879 and 879.5 (Bancoft-Whitney 1990); Colo. Rev. Stat. § 40-15-208 (1999); D.C. Code Ann. § 43-1453 (Michie 1998); Fla. Stat. Ann. § 364.025 (West 1999); Ga. Code Ann. § 46-5-167 (Lexis Law Publishing 1999 Sup.); Haw. Rev. Stat. § 269-42 (1999 Cum. Sup.); Idaho Code § 62-610 (Michie 1994); 220 Ill. Comp. Stat. Ann. § 5/13-301.1 (West 2000 Sup.); Ind. Stat. Ann. § 8-1-2.6-8 (Lexis Law Publishing 1998); Iowa Code Ann. § 476.102 (West 1999); Kan. Stat. Ann. § 66-2008 (1999 Cum. Sup.); Me. Rev. Stat. Ann. tit. 35-A § 7104 (West 1998 pocket part); Md. Code Ann. Pub. Util. § 8-201 (Lexis Law Publishing 1999 Sup.); Mich. Stat. Ann. § 22-1469 (316) (Lexis Publishing 2000 Cum. Sup.); Minn. Stat. Ann. § 237.70 (West 2000 pocket part); Mo. Rev. Stat. § 392.248 (1999 Cum. Sup.); Mont. Code Ann. §§ 69-3-841 and 69-3-842 (1999); Neb. Rev. Stat. § 86-1407 (1999); Nev. Rev. Stat. §§ 704.040 and 707.490 (1999); N.M. Stat. Ann. § 63-9A-6.1 (Michie 1999); N.C. Gen. Stat. Ann. § 62-110 (Lexis Publishing 1999); N.D. Cent. Code § 49-21-01.7 (1999); Okla. Stat. Ann. tit. 17 § 139.107 (West 1999); R.I. Gen. Laws § 39-2-5 (Michie 1997); S.C. Code Ann. § 58-9-280 (West 1999 Cum. Sup.); Tenn. Code Ann. § 65-5-207 (Lexis Law Publishing 1999 Sup.); Tex. Util. Code Ann. § 56.022 (West 1998); Utah Code Ann. § 54-8b-15 (Lexis Law Publishing 1999 Sup.); Vt. Stat. Ann. tit. 30 § 7521 (2000); Wash. Rev. Code § 80.36.610 (1998); W. Va. Code § 24-2C-1 (Lexis Law Publishing 1999); Wisc. Stat. Ann. § 196.218 (West 1999 pocket part); Wyo. Stat. Ann. § 37-15-501 (Lexis Law Publishing 1999).

[1] The trial court held that the assessment imposed by § 16-247e does not constitute a "tax" because it was used to "[pay] for the service for low income persons." Black's Law Dictionary defines "tax" as a "contribution . . . made by the persons liable, for the support of government." Black's Law Dictionary (Revised 4th Ed. 1968). Black's Law Dictionary also provides, "[i]n a broad sense, taxes undoubtedly include assessments, and the right to impose assessments has its foundation in the taxing power of the government; and yet, in practice and as generally understood, there is a broad distinction between the two terms. 'Taxes,' as the term is generally used are public burdens imposed generally upon the inhabitants of the whole state, or upon some civil division thereof, for governmental purposes, without reference to peculiar benefits to particular individuals or property. 'Assessments' have reference to impositions for improvements which are specially beneficial to particular individuals or property, and which are imposed in proportion to the particular benefits supposed to be conferred. They are justified only because the improvements confer special benefits,

merce clause of the United States constitution.[5] In *Goldberg* v. *Sweet*, 488 U.S. 252, 109 S. Ct. 582, 102 L. Ed. 2d 607 (1989), the United States Supreme Court considered the constitutionality of an Illinois statute imposing a tax on interstate telecommunications. The court wrote that "a state tax will withstand scrutiny under the Commerce Clause if 'the tax is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State.' " Id., 257. The court recognized that such "a tax must be structured so that if every State were to impose an identical tax, no multiple taxation would result"; id., 261; and that a state may tax "only that portion of the revenues from the interstate activity which reasonably reflects the in-state component of the activity being taxed." Id., 262. The Illinois statute under review taxed interstate calls that originated or terminated in Illinois and that were charged to an Illinois service address. Id. The court found that, because other states would have a sufficient nexus to tax telephone

and are just only when they are divided in proportion to such benefits." I believe that, whether the burden imposed by § 16-247e is called a tax or an assessment, the legal principles governing the state's taxing power apply to the statute.

[5] I recognize that this claim was not made by the plaintiff, and that this court is not "bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial." Practice Book § 60-5. As we have stated previously, however, "this court is not limited in its disposition of a case to claims raised by the parties and has frequently acted sua sponte upon grounds of which the parties were not previously apprised." (Internal quotation marks omitted.) *State* v. *Gilnite*, 202 Conn. 369, 373, 521 A.2d 547 (1987). We have done so "not by reason of the appellant's right to have [such claims] determined but because in our opinion in the interest of public welfare or of justice between [the parties] it ought to be done." *Leary* v. *Citizens & Manufacturers National Bank*, 128 Conn. 475, 478–79, 23 A.2d 863 (1942). In this case, the validity of § 16-247e under the commerce clause is a matter of law, and, therefore, the absence of a factual record does not hinder our inquiry. Because, in my view, this constitutional issue involves the interest of public welfare and justice between the parties, I would consider it.

calls that originated or terminated in those states and that were billed or paid within those states, there was a possibility of multiple taxation.[6] Id., 263. The court held, however, that the statute's credit provision for taxes that were paid in other states eliminated the possibility of multiple taxation, and that the statute was, therefore, constitutional. Id., 263–64.

Section 16-247e imposes an assessment on "the gross revenues of each telecommunications carrier that are generated in Connecticut, both interstate and intrastate." The phrase "generated in Connecticut" is not defined. As written, the statute could allow Connecticut to assess, for example, revenue from interstate telecommunications that originate and are charged to a service address in another state, and that terminate and are billed or paid in Connecticut. If the other state had a statute like § 16-247e, that state could also assess revenues from the telecommunication, thereby subjecting the revenues from the call to multiple taxation. Section 16-247e contains no provision allowing a credit for assessments paid in other states. Therefore, I believe that the portion of the statute assessing revenues from interstate telecommunications cannot withstand scrutiny under the commerce clause.

---

[6] The court wrote, "[t]hose taxpayers who split their billing and service addresses between two different States face a risk of multiple taxation on a limited number of their interstate telephone calls. For example, if a company's Arkansas headquarters paid the telephone bills of its Illinois subsidiary, two state taxes would be paid on telephone calls made by the Illinois subsidiary to the head office or any other Arkansas location. Such calls would terminate and be billed or paid in Arkansas, and they would also originate and be charged to an Illinois service address. Likewise, a collect call from the Arkansas headquarters to the Illinois subsidiary could be taxed in both States. The collect call would originate and be billed or paid in Arkansas, and it would also terminate and be charged to an Illinois service address. Noncollect calls from the Arkansas headquarters to the Illinois subsidiary would not, however, be captured by the Illinois Tax Act. Likewise, the Arkansas statute would not tax interstate calls made by the Illinois subsidiary to States other than Arkansas." *Goldberg* v. *Sweet*, supra, 488 U.S. 263–64 n.13.

The department in its decision ruled that "funding of the Lifeline Program credit should be based on each carrier's intrastate and interstate gross revenues subject to Connecticut sales tax. . . ."[7] This court previously has held that "the constitutionality of a statute [should not] be made to depend upon the way in which it is finally administered by those who are charged with its execution." *State* v. *Coleman*, 96 Conn. 190, 196, 113

[7] General Statutes § 12-407a, entitled "Basis for determining whether a telecommunications service is subject to tax under this chapter," provides: "(a) The rendering of telecommunications service shall be subject to tax under this chapter as a sale, for purposes of subdivision (k) of subsection (2) of section 12-407 when such service is (1) (A) originated in this state and terminated in this state, (B) originated in this state and terminated outside this state and with respect to which such service is charged to a telephone number, customer or account located in this state or to the account of any transmission instrument in this state or (C) originated outside this state and terminated in this state and with respect to which such service is charged to a telephone number, customer or account located in this state or to the account of any transmission instrument in this state or (2) rendered by providing a private interstate telecommunications line on which the customer for such line has two or more locations connected to such line and the charges for which are related to (A) the number of customer locations connected to such line in this state, (B) the distance between customer locations connected to such line in this state and (C) a portion of such line determined by a ratio, the numerator of which is the number of air miles between the state border and the denominator of which is the number of air miles between said closest connection to the state border in this state and the customer location connected to such line which is closest to the state border outside this state.

"(b) For purposes of determining the application of tax under this chapter to cellular mobile telecommunications service in accordance with subdivision (1) of subsection (a) of this section, (A) a call originated from a cellular mobile telephone shall be deemed to have originated in this state if the first site in a cellular telephone system, at which messages to or from cellular mobile telephones are transmitted or received, to establish a completed call is located in this state, (B) a call terminated at a cellular mobile telephone shall be deemed to have terminated in this state if the first such site to transmit the call to such telephone is located in this state, (C) a call originated in this state as described in subparagraph (A) of this subsection shall be deemed to have originated and terminated in this state if the call terminates in this state and (D) a call terminated in this state as described in subparagraph (B) of this subsection shall be deemed to have originated and terminated in this state if the call originates in this state."

A. 385 (1921). Therefore, even if it is assumed that the department's construction of the statute is proper, and even if it is assumed that that construction could withstand scrutiny under the commerce clause, that would not cure the statute's constitutional infirmity.

Accordingly, I respectfully concur in part and dissent in part.